VINCENT WENZELL, a Minor, by BEVERLY DOMEK, his Mother and Next Friend, Plaintiff-Appellant, *v.* MTD PRODUCTS, INC., Defendant-Appellee.

(No. 59134;

First District (1st Division)—September 15, 1975.

*Rehearing denied October 10, 1975.*

Raymond Concannon, of Miller & Concannon, of Chicago (Sidney Z. Karasik, of counsel), for appellant.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Perry L. Fuller, D. Kendall Griffith, and Stanley J. Davidson, of counsel), for appellee.

Mr. JUSTICE GOLDBERG delivered the opinion of the court:

On June 18, 1966, Vincent Wenzell (plaintiff), a minor then 4 years old, was injured by a gasoline powered lawn mower, designed, manufactured and distributed by MTD Products, Inc. (defendant). Plaintiff's second amended complaint was based upon strict tort liability, resulting from allegedly defective design and construction of the machine. After a jury trial, a verdict was rendered in favor of defendant. Usual post-trial motions were denied. Plaintiff appeals.

The lawn mower was owned by the family of Randy Riley who was then 7 years of age. The incident occurred on the family property. A number of boys were present. Two of them testified as part of plaintiff's case. They were: Douglas Gale, then 10 years old, and James Ostergrand, then 16. During the early part of the afternoon, Randy Riley, Douglas Gale and James Ostergrand had taken turns in driving the mower. The machine was a type upon which the rider sat and manipulated the controls. The boys had cut the grass in the Riley front-yard and then the mower was moved to the backyard.

Plaintiff entered the backyard and began playing at the swing which was off in one corner. The remaining boys had been riding the lawn mower in the backyard for about 10 minutes before plaintiff arrived. After about 20 minutes, Douglas Gale had completed his turn to operate the machine. He put the gear lever in neutral position and got down from the seat. Randy Riley then got up on the machine. He put the mechanism in reverse gear to avoid a tree a short distance in front of it. About that time, plaintiff left the swing and ran over to the group to speak to one of the boys. At that moment, the mower moved back and in about 2 feet it came in contact with plaintiff.

Douglas Gale testified that the machine "jerked back". However, in his discovery deposition, he had testified that the mower came "back smoothly" and that it would not jerk back when it was put in reverse. The trial took place in January of 1973, about 6½ years after the occurrence. The discovery deposition was taken in May of 1968. Douglas Gale also testified at trial that the mower was moving when it came in

contact with plaintiff. Plaintiff fell on his back and his left foot fell under the left side of the mower. The witness stated in his deposition that the rear portion of the mower came in contact with plaintiff but he did not remember whether it was the left or the right foot. His testimony was that plaintiff's foot came in contact "with the far left side of the mower."

The witness further testified at trial that Randy Riley was looking straight ahead and did not look around behind him when he put the machine in reverse gear. He also testified that plaintiff did not try to get out of the way. In his deposition, he stated that, as the mower was reversing, plaintiff tried to get out of the way but, "it didn't work too good." The witness testified at trial that after the occurrence James Ostergrand stopped the machine and knocked the driver off. The witness also testified that he had seen Randy Riley operating the mower previously but had never observed him changing the direction of the machine. He did not recall his answer in the discovery deposition that he had seen Randy Riley change the direction of the machine and that the boy could use the gearshift "real good."

The other occurrence witness, James Ostergrand, testified that Randy Riley had driven the machine twice around the backyard during the time that plaintiff was playing on the swing. Douglas Gale then took a turn at driving the machine around the yard. During this time the grass was being cut by the mower. Douglas Gale then stopped the machine and the witness took a turn. He operated the mower without reversing it and during that time it was cutting grass. He then stopped the machine, shifted the gears to neutral position and dismounted. The engine stopped because of a clogging of grass. Randy Riley then got on for his turn at driving and Douglas Gale started the mower for him. Plaintiff was then getting off of the swing to approach the group. Plaintiff came up toward the group and about 2 feet behind the lawn mower just as Randy Riley started the machine. The testimony was that Randy was trying to put the machine in forward gear "and he missed it and he put it in reverse." He saw Randy Riley put the machine in reverse. The mower had backed up about 2 feet when it came in contact with plaintiff. The mower jerked backwards. It moved back fast for about a foot and one half and then slowed down. Randy Riley did not look behind him before he backed up. Plaintiff did not move from the time the lawn mower began its backward motion until the time of the contact. Plaintiff was then looking toward the lawn mower. The contact knocked him down and his foot was run over. His left leg was extended with his left foot pointing directly upward underneath the mower. Both feet were under the mower but only plaintiff's left foot was hurt.

Although mindful of the proverb that one picture is worth 10,000

words and also of the presence in this record of several photographs of the mowing machine, we shall attempt a description thereof and also a statement of how the mechanism operates. Part of this information was supplied by the testimony of four experts which will be later summarized. The machine in form is a tractor or similar to the stripped chassis of an automobile. It has two fenders or mudguards, one for each rear wheel, but none for the two front wheels. The operator sits on top of the machine toward the rear. At the front, covered by a metal hood, is a small gasoline powered motor. Tires are mounted on wheels appended to two axles. There is a type of steering wheel in front of, and readily accessible to, the driver for varying the direction of the front wheels and accordingly of the machine. Power is transmitted to the driving wheels at the rear. There is a brake on the driver's left which can tighten upon the left rear wheel for stopping, Power is transmitted from the engine to a transmission under the seat and from the transmission to the rear drive wheels by means of a chain and sprocket assembly on the bottom close to the left side.

The grass is cut by means of a large blade under the machine with its upper surface completely covered by a circular housing. This rather formidable blade is virtually as long as the entire width of the mower itself. The operator starts the engine by pulling a cord under the hood. The entire machine, independently of the blade, may then be set in motion. To do this the gearshift lever at the left of the driver must be activated by placing it from the neutral position into forward or reverse as desired. The operator then presses a clutch pedal which is on his right side. This will set the machine in motion. When the operator is ready to cut grass, he engages or lowers the blade by releasing the foot pedal, moving the engine throttle to fast position and then slowly moving a blade engagement lever on the left side until the blade is in motion. The throttle control may be set at a slower speed, as desired. To stop the motion of the blade, it is necessary to move the blade lever to the disengage position.

The transmission lever operates by moving a so-called dog gear back and forth. This gear is thus made to mesh with the gears for forward or reverse motion as desired. The machine will not move, however, by shifting the gears without also depressing the clutch lever. The gearshift is fitted with a so-called detent devise which fixes the positions of the operating lever as desired; that is, neutral, forward or reverse. The point is made in the testimony that this detent in the machine in question is covered by the gear box so that the actual engagement of the gearshift lever may not be observed by the driver. It should also be noted that the lower surface of the sprocket and chain assembly are exposed

with nothing between this mechanism and the ground. For safety of the driver, the upper surface of the sprocket is completely enclosed by a cover. There is no guard at the back and bottom portions of the sprocket. The bottom of the sprocket clears the ground by approximately 2 inches. The sprocket moves clockwise in the forward motion and counterclockwise when moving in reverse.

Four expert witnesses testified. Plaintiff called Marvin Salzenstein, a qualified mechanical engineer, who specializes in machine design. He had examined and tested this mower. He stated that when he carefully moved the gearshift lever so as to make just initial contact with the reverse gear, depression of the clutch pedal did not place the machine in motion. However, the slightest additional movement of the lever would then engage the gears and the machine would reverse "rather suddenly." The witness also testified to the difference between external and internal detents on a gearshift mechanism. This testimony will be later summarized. He also pointed out the condition of the sprocket and chain assembly with reference to the presence of the guard.

Plaintiff offered in evidence a pamphlet containing safety specifications adopted by the American Standards Association for power lawn mowers. This publication provided in paragraph 2.2.11 that "all moving chains, belts, and gears shall be enclosed or adequately guarded to prevent personal injury." These standards did not cover the detent system or the dog gears. The expert criticized the lack of enclosure of the sprocket on the underside of the machine. In response to a hypothetical question, he expressed the opinion that the machine was unreasonably dangerous for its intended purpose or use. He based this opinion upon the theory that a sudden and erratic movement of the machine constituted the danger because of the possibility of a sudden application of power by engagement of gears which the operator did not intend. In the opinion of the witness this created a hazard to the operator as well as to people around him.

The witness also testified that failure of the sprocket and chain assembly to conform to the requirements of the American Standards Association, in his opinion, created an unreasonably dangerous situation as the open sprocket could catch a portion of a person's body and, if it were beneath the mower, the mechanism would tend to ride over it. In his opinion, the close proximity of the chain driven sprocket to the ground formed a dangerous "nip point" with the ground itself.

On cross-examination, the witness conceded that the written warranty and safety rules furnished by defendant with the machine were correct in classifying the mower as a piece of power equipment. He agreed that extreme caution should be exercised at all times in the operation of the

machine which was not a toy. The instructions supplied by defendant state that the machine is not a toy and that it "should not be used by anyone until they fully understand the operating instructions." He personally agreed with the admonition that children or young teenagers should never be allowed to operate a power mower. The pamphlet issued by the American Standards Association provides in the appendix a warning to the same effect.

Plaintiff also called Donald Thon, defendant's safety engineer, for adverse examination. This witness did not have higher education but he was employed by defendant for 21 years. He was completely familiar with the machine in question which was manufactured by defendant between November of 1963 and May of 1964. He was also familiar with the safety specifications of the American Standards Association which were first promulgated in 1960, then updated in 1964, 1968 and 1972. He had served on a committee which participated in the formulation of all of these standards. The pamphlet offered by plaintiff was the one approved in 1960. He expressed the opinion that this specific mower complied with all of the standards and specifications contained in this pamphlet which he described as minimum standards to protect the public. In this he included the safety of the operator as well as the bystander.

The witness expressed the opinion that the machine complied with that portion of the standards which pertained to an adequate guard upon the moving chain. The witness testified that the sprocket at the rear portion of the machine, approximately 2 inches above the ground, did not create a "nip point" with the earth. He was questioned by plaintiff's counsel regarding later models of a similar machine designed and distributed by defendant commencing in 1967 or 1968. This model had a flange across the rear end. But the witness testified that his modification resulted from a difference in the type of frame. The later model was manufactured with a one-piece frame. This modification was not intended as a covering for the rear sprocket.

In the new model, the sprocket extended below the lowest part of the main frame and it cleared the ground by 2⅝ inches. The purpose of the flange was protection of the machine itself in the event that the operator reversed and unintentionally drove over a low obstruction which could damage the mechanism beneath the frame. The installation of a plate or bar across the rear of the machine would thus interfere with clearance and would make the machine more subject to tipping over. In his opinion, the machine was reasonably safe for the purpose for which it was intended at the time it left the control of defendant. In addition, in his opinion, the sprocket and chain assembly were ade-

quately covered and guarded in accordance with the safety specifications of the American Standards Association as promulgated in all of the years including 1972.

The third expert was George Harper, a professor of mechanical and industrial engineering at the University of Illinois, a witness for plaintiff. He expressed the opinion that the guard covering the top of the chain and sprocket assembly gave adequate protection only for the operator but not for anyone else. He defined a "nip point" as "something that catches and holds." Thus, as the rear sprocket and chain rotated in reverse, this would create a nip point against the earth which raised a danger of catching and holding any article that the machine would encounter when reversed. To eliminate this problem, which the witness had encountered on other similar mowers, he had designed a guard plate to be installed across the rear wheels of the machine. Two hinged flaps were attached to this guard in position to touch the top of the grass. In this manner the plate would act as a bumper guard and eliminate the danger from the nip point. This was his own personal design and it had not been tested against any set of standards.

As regards the specific mower involved, the witness expressed the opinion that the chain and sprocket assembly was not sufficiently enclosed and that the lack of a proper guard made it substandard and could lead to personal injury. In his opinion, the assembly did not meet the published standards and the machine was therefore "unduly hazardous to a bystander." In his opinion, this hazard would be considerably reduced by installation of the guard device he advocated. The cost of this modification would be approximately $3.50 or less. A flat bar of this kind would eliminate the nip point. It would tend to push away from it any object with which it made contact.

On cross-examination the witness stated that he had not communicated with the American Standards Association regarding the design of lawn mowers and had never worked on industry standards. He agreed that his suggested modification would need additional tests and experiments. He also agreed with the proposition that children or young teenagers should not be allowed to operate power mowers and that since the mower was a power tool and definitely not a toy, children should be instructed to keep away from it at all times when it was in operation.

The last expert, Joseph Silbereis, was called by defendant. He is a graduate mechanical engineer with industrial experience. He was a member of the American Standards Association and had worked on the subcommittee for engineering safety since 1960. He had served as secretary and chairman of the committee. He had examined the lawn mower involved. He expressed the opinion that the chain and sprocket assembly

of the machine was properly guarded in compliance with the safety specifications of the Association. The guard or housing protected the operator of the machine by eliminating the possibility of injury from the moving chain. The accepted standards did not require any certain ground clearance of the rear end of the frame for the protection of the operator.

The witness disagreed with the result of affixing a bar to the rear frame. In his opinion, this would create a danger of tipping the machine if it should encounter some object or obstruction when in reverse. In his opinion, as a matter of design, it would be preferable to have the ground clearance reduced toward the center of the machine, closer to the front, so that if an obstacle should be encountered the machine would tend to stop instead of tipping. In his opinion, the design of the sprocket and chain was reasonably safe for the purpose intended at the time of manufacture and he found no defect of design with reference to omission of a rear guard. In promulgating the standards of the Association, the framers had considered the presence of children when the mower was operating as well as the condition of the ground surface.

The witness also expressed the opinion that the idea of affixing a plate to the rear end of the mower would increase the possibility of danger from the machine. An obstacle encountered in reverse would tend to catch the machine or throw it backwards so as to unseat the rider. In his opinion, the industry itself was interested in safety as regards children as the power mower is a dangerous instrument. He reasoned that the operator is in close proximity to the machine at all times while it is operating as distinguished from the general lack of proximity by the ordinary bystander so that the operator should be given priority in the creation of safety standards. The standards of the Association were intended to protect both the operator and the bystander. The particular section of the standards pertaining to the guarding of moving chains was directed exclusively to protection of the operator.

In this court, plaintiff urges that the jury was not properly instructed because no instruction was given as to the duty of a manufacturer of a defectively designed product toward a bystander; the court erred in striking plaintiff's pleading and evidence regarding the detent and the clutch gear system of the mower and the instruction on the issues as given omitted reference to plaintiff's contention of unreasonably dangerous design of the detent and clutch gear system. Plaintiff also contends that the trial court erred in its rulings on the evidence in striking the testimony pertaining to the allegedly defective detent and clutch gear system; in excluding evidence as to whether defendant attempted to produce a mower going beyond the "minimal" standards of the Standards

Association and in other specified rulings. In response, defendant urges that any error which occurred during the trial was harmless because plaintiff could not recover as a matter of law. This was because the occurrence was not reasonably foreseeable; the proximate cause was operation of the mower by a 7-year-old child who intentionally put the machine into reverse and that the mower was misused as a matter of law. Defendant also urges that the jury was properly instructed with reference to the duty of defendant to a bystander; the trial court properly struck pleadings and evidence relating to the detent and the clutch gear system and the remaining issues raised by plaintiff did not actually constitute prejudicial trial error.

■■ In our opinion, the central and decisive point here is the issue of proximate cause raised by defendant. As the trial court properly instructed the jury, the proof of proximate cause was a necessary element in plaintiff's case. The court defined the expression "proximate cause" in the given IPI instruction tendered by plaintiff. (Plaintiff's instruction no. 4, IPI 2d No. 15.01 (1971).) The applicable principle is set forth in *Rios v. Niagara Machine & Tool Works*, 59 Ill.2d 79, 319 N.E.2d 232. The supreme court there pointed out that the basic premise of strict tort liability is "that the injury is caused by the unreasonably dangerous condition of the product." (59 Ill.2d 79, 86.) The court followed the statement with this language:

> "Since there is no evidence which causally connects the plaintiff's injury with the unreasonably dangerous condition of the machine alleged in the complaint he may therefore not recover  *  *  * under the principles of strict tort liability."

In the case before us, the expert testimony for plaintiff was that the proximity of the chain and sprocket assembly to the ground constituted a hazardous nip point between the earth and the revolving rear sprocket. Thus there was a danger of catching and holding any obstacle that the machine might encounter when reversed. This was denied by defendant's evidence with expert testimony that the installation of a guard bar across the rear of the machine would make it unreasonably dangerous by creating a hazard of tipping over when reversing. Thus the issue of the existence of the allegedly dangerous defect was a factual question for the jury.

However, notwithstanding the result which might be reached by any fact finder on this issue, there is no evidence to show that this allegedly dangerous condition, if it existed, was the proximate cause of plaintiff's injury. One witness testified that plaintiff fell on his back and his left foot fell under the mower and came in contact with the far left side of the mower. The same witness testified on his discovery deposition that

he did not remember which foot, left or right, came in contact with the mower but that contact was made with "the rear portion of the mower." Although the sprocket is located to the left of the center of the machine, it cannot be described as being located at the far left side of the machine. The other eyewitness testified that plaintiff was knocked down by the mower and that "his foot was run over." There is thus no evidence in this record to show that plaintiff's foot ever made contact with the chain or the sprocket or that it was ever caught and held between the earth and the sprocket as a nip point.

In our opinion, the case before us is legally similar to the situation in *Rios*. There, a punch press was manufactured and sold by defendant. The defendant did not provide a safety device. Plaintiff's employer equipped the press with a safety device. The parties stipulated that at the time of the occurrence the device had broken and was inoperable. There was no evidence as to the cause of this condition. As the supreme court pointed out, there were many possible causes for the failure of the safety device. (59 Ill.2d 79, 86.) But, there was no evidence that the proximate cause of the occurrence was the failure of the manufacturer to equip the machine with a safety device, which was the unreasonably dangerous condition alleged by plaintiff.

Application of the concept of proximate cause to strict tort liability has been universal in Illinois since the law on this subject was formulated and expressed in *Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182. The supreme court stated there that a plaintiff must prove that the "injury or damage resulted from a condition of the product * * *." (32 Ill.2d 612, 623.) This requirement has since been uniformly applied by the courts of Illinois. We are not dealing here with a conflict of evidence which ordinarily makes the issue of probable cause a question for the trier of fact. (*Juliano v. Oravec*, 53 Ill.2d 566, 571, 293 N.E.2d 897.) We have here a case in which evidence of proximate cause is completely lacking from the record. Nor can we accept plaintiff's contention that the operation of the machine by the juvenile was merely an intervening act and thus did not break the established chain of causation. There is no evidence here which creates the necessary chain of causation flowing from the alleged design defect. This is, in our opinion, a fatal defect in plaintiff's case.

The issue of foreseeability next requires consideration. In this connection, we will also consider plaintiff's first contention regarding failure of the court to instruct the jury as to the duty of a manufacturer toward a bystander. Plaintiff tendered instructions nos. 13 and 14 both of which were refused by the trial court. Instruction no. 13 provided:

"One who manufactures any product in a defective condition un-

reasonably dangerous to a person is subject to liability for physical harm thereby caused to the person."

Plaintiff's instruction no. 14 read:

"You are instructed that a manufacturer of a product who sells such a product in an unreasonably dangerous condition is liable for any physical harm caused thereby to a person. This rule applies even though the injured person is not the owner of the product."

Defendant's instruction no. 6 (IPI 2d No. 21.02 (1971) as modified) on burden of proof on the issues, was given by the court over objection by plaintiff. This instruction read:

"The plaintiff has the burden of proving each of the following propositions:

First, the lawn mower in question was defectively designed in the way claimed by the plaintiff in these instructions;

Secondly, that the defect existed at the time the lawn mower left the control of the defendant;

Third, that the defect made that lawn mower unreasonably dangerous when used for the purposes intended;

Fourth, that the defect was a proximate cause of the injury to the plaintiff.

If you find from your consideration of all of the evidence that each of these propositions has been proved, then your verdict should be for the plaintiff, but, if, on the other hand, you find from your consideration of all of the evidence that any of these propositions has not been proved, then your verdict should be for the defendant."

In our opinion, the trial court's ruling was legally correct. Defendant's instruction no. 6 stated the law correctly concerning the burden of proof which rested upon plaintiff. Plaintiff's instructions nos. 13 and 14 are virtually identical except for the last sentence. Aside from this last sentence, the giving of both of these instructions would have been a useless and perhaps a confusing duplication. We agree with the comment of the trial court at the conference on instructions directed to the fact that giving either one or both of these instructions tendered by plaintiff would cause unnecessary and possibly prejudicial repetition of the phrase "unreasonably dangerous." The jury was given sufficient and proper guidance by defendant's instruction no. 6.

The last sentence of plaintiff's refused instruction no. 14 stated that the rule concerning strict tort liability would apply "even though the injured person is not the owner of the product." Actually there was no need for bringing this issue before the jury in this manner. The status of

plaintiff as a bystander was necessarily inherent in, and a part of, plaintiff's case. The legal propriety of the court's ruling in refusing this instruction is demonstrated by *Winnett v. Winnett*, 57 Ill.2d 7, 310 N.E.2d 1. The issue there was whether plaintiff's complaint stated a cause of action in a strict tort liability case. Plaintiff, a minor 4 years of age, visited her grandfather's farm when he was operating a forage wagon. The child was injured when she placed her fingers upon a moving conveyor belt on the wagon. The case presented the issue as to liability of a manufacturer to the child as a bystander. The supreme court held the complaint failed to state a cause of action. The court cited a large group of American cases all of which "have found the terms 'bystander' or 'innocent bystander' a convenient means of categorizing an additional group of persons for whose injuries courts have allowed recovery." (57 Ill.2d 7, 10.) However, the court found this attempted categorization helpful only in a general way and then stated the pertinent test in this aspect of strict tort liability in all cases, whether involving consumers or bystanders, as follows (57 Ill.2d 7, 11):

> "In our judgment the liability of a manufacturer properly encompasses only those individuals to whom injury from a defective product may reasonably be foreseen and only those situations where the product is being used for the purpose for which it was intended or for which it is reasonably foreseeable that it may be used."

The issue, then, in the case before us is not the statute of plaintiff as a bystander. Instructing the jury on this subject was totally unnecessary. The decisive issue is whether the injury of plaintiff in this manner was reasonably foreseeable.

In the case before us, the mower was being operated by a child 7 years old. Further, it was in operation in the backyard while plaintiff, then 4 years old, was in the same yard. The evidence shows that this mower is indeed a power tool and certainly not a toy. The expert witnesses all agree with the correctness of this proposition and with the fact that a power instrumentality of this kind should not be operated by a 7-year-old child and certainly should not be operated in the presence of young children. The safety specifications above described contain, as a suggestion for users, the statement that children or young teenagers should never be allowed to operate a power mower. The warranty and safety rules issued by defendant pertaining to this mower state that it is a piece of power equipment, not a plaything, and that extreme caution should be exercised at all times; also that children and pets should be kept away from the area at all times during mowing operations. One glance at the photographs of this machine and at the large

metal blade it employs should convince any person of the validity of all of these admonitions.

In the case before us, it was certainly not reasonably foreseeable that the owner or user of this machine would permit this type of instrumentality to be operated by a child 7 years old, in the presence of other children. This mower was being used by a group of children virtually as a toy. The case is governed by *Winnett,* where the court held that it was not reasonably foreseeable that a 4-year-old child would be in the immediate proximity of the moving conveyor belt on the forage wagon. It is most valuable in this connection to read the *Winnett* opinion which states: "Foreseeability means that which it is *objectively reasonable* to expect, not merely what might conceivably occur." (57 Ill.2d 7, 12, 13.) At this point the court also quote from *Mieher v. Brown,* 54 Ill.2d 539, 544, 301 N.E.2d 307, "In a sense, in retrospect almost nothing is entirely unforeseeable."

In *Winnett,* the court also pointed out that, "[q]uestions of foreseeability * * * are ordinarily for a jury to resolve, as is the question whether a product is defective or unreasonably dangerous." (57 Ill.2d 7, 13.) In the case before us, it cannot reasonably be said that the manufacturer should have foreseen operation of its product by a 7-year-old child in the proximity of an even younger person. The verdict of the jury was correct as any other result would be manifestly contrary to law. The imposition of liability upon the manufacturer here would make it virtually an insurer of the product, a completely inequitable result.

■■ Defendant also raises the issue that the mower was misused as a matter of law. In view of the foregoing we need hardly comment upon this additional contention. It is sufficient to state that the concept of misuse of the product, as well as proof by plaintiff of the unreasonably dangerous condition or foreseeability of the injury and proof of proximate cause, are closely related in strict tort liability cases. In *Williams v. Brown Manufacturing Co.,* 45 Ill.2d 418, 431, 261 N.E.2d 305, the court was careful to take note of this relationship:

> "In addition, as earlier noted, plaintiff's misuse of the product may bar recovery. This issue may arise in connection with plaintiff's proof of an unreasonably dangerous condition or in proximate causation or both."

In our opinion, *Rios* and *Winnett* are respectively decisive of the issues of proximate cause and foreseeability. No other authority is required. However, we should take note of the decision of the Supreme Court of Missouri in *Hays v. Western Auto Supply Co.* (Mo. 1966), 405 S.W.2d 877, which involves a strikingly similar set of facts. There, a child between 2 and 3 years old was injured by a riding power mower being

operated in reverse by his 8-year-old brother. The case was tried on theories of negligence and implied warranty and decided before *Suvada*. However, it may have some significance here because in affirming the action of the trial court, which directed verdicts against plaintiff, the reviewing court pointed out that the injury of the child in this manner was "not a reasonably foreseeable situation." (405 S.W.2d 877, 884.) On the same page of the opinion, the court quoted from 1 Frumer & Friedman, Products Liability § 18.07 (1975):

> "[U]nforeseeable acts of third persons may constitute a superseding cause of the accident which will exonerate a retailer or dealer from liability."

Although these matters of proximate cause and foreseeability require affirmance of the judgment appealed from, we will, for completeness, consider the various alleged trial errors raised by plaintiff.

Defendant contends that the court erred in striking certain specific charges of faulty design alleged in plaintiff's complaint together with the evidence pertaining to these issues. These stricken portions alleged that the mower was faulty in design because defendant:

> "(e) failed to have external detent system so as to prevent accidental reversal of the unit without intent of the operator.
>
> (f) failed to have external detent system so as to prevent sudden and rapid movement to the rear without intent of the operator.
>
> \*     \*     \*
>
> (m) failed to design and provide gear mechanism and clutch collar so that the reverse gear would smoothly move into reverse position on movement of gear lever;   \*   \*   \*"

The trial court granted defendant's motion to strike these allegations primarily upon the theory that the child who was operating the mower intentionally placed the machine in reverse gear and intended that the mower move backward when it did. The only testimony in support of these allegations was that given by plaintiff's expert, Marvin Salzenstein. He testified regarding a test that he had made of the machine by moving the gearshift lever into reverse position so that the movable dog gear barely came in contact with the reverse gear. Depression of the clutch pedal would then fail to cause motion by the machine. With the slightest additional movement of the gearshift lever, the gears would engage and "the mower would go back very suddenly."

The expert criticized the design of the machine by pointing out that it lacked an external detent on the gearbox although it did have an internal detent. He expressed the opinion that this design made the detent system unreasonably dangerous because the operator could never be sure

of the position of the gears so that there might be a sudden application of power to the rear wheels which the driver did not intend. This testimony was stricken by the court with the comment that there was no showing that the detent system was in any way related to the movement of the mower or to the rapidity thereof at the time and place in question.

"Detent" is defined as "a part of a mechanism that locks or unlocks a movement * * *." (Webster's Third New International Dictionary.) It is agreed that this particular machine has an internal detent so that the gearshift lever will be held in the position to which it is moved by the operator. The pictures in evidence show that, directly at the gearbox assembly, there is a metal plate affixed to the machine indicating the three possible positions of the lever as "reverse," "neutral" and "forward." The last-named position is more to the front of the machine. In this connection, it would appear to a layman that the gearshift lever on this mower is no different than that of any automobile.

In our opinion, the ruling of the trial court was correct. The child who was operating this machine clearly intended that it move in reverse as it did. The boy who previously drove the machine had left it so that it was necessary for the next driver to reverse in order to avoid a tree. In addition, the plaintiff was so close to the machine as it went into motion, only 2 feet away, that the nature of its movement, whether smooth or jerky or swift or slow, actually had no material relation to the injury suffered.

We will also point out that the opinion of the expert in this regard is patently based upon his own experiment in moving the gearshift lever just to the point of barely making contact with the reverse gear. This was a studied and intentional movement of the gearshift lever by the expert and there is no evidence in the record to show that the same type of movement was engaged in by the juvenile driver. On the contrary, it is more logical to assume that, if the gearshift lever were put into reverse position, as plainly noted by the legible designation thereof, the internal detent, admittedly provided with the machine, would keep the lever and the gears in proper position until reset by the operator.

Plaintiff also urges error concerning the fact that the court struck paragraph 7(b) of the complaint:

> "(b) failed to have rear guard covering for the rear axle, sprocket
> and chain assembly in violation of Section 2 2.11 of American
> Standard Safety Specifications B71.1—1960, B71.1—1964."

In our opinion, the trial court acted correctly in this ruling. The standards contained in the American Standards Safety Specifications do not have the effect of law but are only evidentiary, together with the opin-

ions of experts, as to whether the mechanism in question was or was not unreasonably dangerous. (Note *Tenenbaum v. City of Chicago*, 60 Ill.2d 363, 375, 376, 325 N.E.2d 607, involving structural work, citing *Darling v. Charleston Community Memorial Hospital*, 33 Ill.2d 326, 211 N.E.2d 253, a negligence case.) Thus, a violation of these standards would not of itself vest a cause of action in plaintiff. The rights of plaintiff and the theory of the case he asserted were fully protected by the court. Paragraph 7(c), which remained in the case, alleged:

> "(c) failed to have rear guard plate or bar to prevent the mower from running over anyone while the mower was backing up."

There was evidence in the record by plaintiff's experts Marvin Salzenstein and George Harper that the unguarded sprocket at the rear would create a nip point with the earth. George Harper also described how the rear guard plate which he designed might have eliminated the danger. In addition, the court instructed the jury in the issues instruction that plaintiff claimed that the mower was unreasonably dangerous in that it was defectively designed since it "did not have a rear guard plate or bar to prevent the mower from running over anyone while the mower was backing up." This was in accordance with, and fully covered, paragraph 7(c) above. Also the standards themselves were received in evidence and considered by the jury.

During adverse examination of defendant's safety engineer Donald Thon, he testified that these standards were the accepted minimum standards adopted for use in the power lawn mower industry and that, to his knowledge, at the time of the manufacture of the mower there were no other standards. He was then asked if defendant went beyond the minimum standards in its manufacture and design of the mower. The court sustained an objection to this question on the ground of relevance in that the witness had previously responded that there were no other standards to his knowledge. Counsel for plaintiff then asked the witness if he would say that these minimum standards were adequate to the consumer. The court sustained an objection to this question on the ground that it was overly general. Counsel for plaintiff then cured this objection by asking the witness his opinion as to whether the standards were adequate in terms of safety to the public concerning this particular machine. The witness responded, without objection, that they were adequate as to the state of the art at that time. A question was then put as to whether those standards were adequate today and an objection by plaintiff was sustained. Plaintiff's counsel then asked whether the witness was aware that, when the machine was manufactured, there were standards beyond those of the American Standards Association. An objection was made, there was a discussion between the court and counsel

off the record, and plaintiff's attorney then proceeded with a different subject matter. It is correct, as defendant urges, that thereafter plaintiff did question his own witness, Marvin Salzenstein, regarding standards beyond the minimum standards. Defendant objected but the court overruled the objection and the witness responded that there were standards promulgated by another society which provided for guarding of moving parts such as the sprocket in question. Plaintiff thus did inform the jury that there were in existence standards more stringent than those of the American Standards Association. We find no prejudicial error in this regard.

Plaintiff also urges other alleged trial errors such as permitting defendant to impeach plaintiff's witness Douglas Gale on irrelevant or collateral issues; excluding further testimony by plaintiff's expert George Harper regarding the final report of the National Commission on Product Safety and other rulings by the court on evidence which are not argued in plaintiff's brief or reply brief but which are set forth in paragraphs 7, 9 and 12 of plaintiff's post-trial motion.

We have examined the record regarding each and all of these errors. The matters regarding impeachment of the witness Douglas Gale by use of his deposition were, in our opinion, all within the discretion of the trial court. (*Sweeney v. Matthews & Co.*, 46 Ill.2d 64, 71, 264 N.E.2d 170.) We cannot say that the record shows any abuse of this discretion. The same comment disposes of the alleged error in connection with the cross-examination of plaintiff's expert George Harper. In addition, the testimony of this expert regarding the government report was properly excluded because the document was issued at least six years after the manufacture of this mower. (See *Vroman v. Sears, Roebuck & Co.* (6th cir. 1967), 387 F.2d 732.) The various alleged errors not raised or argued by plaintiff in his initial brief in this court are deemed waived. Supreme Court Rule 341(e)(7), Ill. Rev. Stat. 1973, ch. 110A, Rule 341(e)(7); *Crane Construction Co. v. Symons Clamp & Manufacturing Co.*, 25 Ill.2d 521, 527, 185 N.E.2d 139.

■■ Finally, the report of proceedings comprises close to 1200 pages. The trial was strongly contested by able counsel for both sides. The ultimate question for our determination "is not whether a trial was scrupulously free from error, but whether there was error which operated to the prejudice of the appealing party or unduly affected the outcome below." (*Department of Public Works & Buildings v. Klehm*, 56 Ill.2d 121, 131, 306 N.E.2d 1, *cert. denied*, 417 U.S. 947, quoting from *Bruske v. Arnold*, 44 Ill.2d 132, 139, 254 N.E.2d 453, which in turn quoted from *Nelson v. Union Wire Rope Corp.*, 31 Ill.2d 69, 118, 199 N.E.2d 769.) Upon careful consideration of each and all of the errors urged by plain-

tiff, we conclude that we cannot say that any of these alleged errors, or all of them in combination, operated to plaintiff's prejudice or prevented a fair trial. For these reasons the judgment appealed from is affirmed.

Judgment affirmed.

BURKE, P. J., and SIMON, J., concur.