LINDA LEE LEBRECHT, Plaintiff-Appellant and Cross-Appellee, v. K. TULI, M.D., *et al.*, Defendants-Appellees and Cross-Appellants (Area E-7 Hospital Association, Defendant).

Fourth District No. 4—83—0831

Opinion filed January 17, 1985.

458

William D. Maddux, Bruce M. Lane, and Steven K. Jambois, all of William D. Maddux & Associates, of Chicago, for appellant.

Todd M. Tennant, of Dobbins, Fraker, Tennant, Joy & Perlstein, of Champaign, for appellees M. R. Carlson and Christie Clinic.

Richard F. Record, Jr., and Richard C. Hayden, both of Craig & Craig, of Mattoon, for other appellees.

JUSTICE MILLS delivered the opinion of the court:
Medical malpractice.
Bifurcated trial.
Patient won on statute of limitations.
Doctors won on negligence.

Appeal and cross-appeal.

We affirm across the board.

Linda Lee Lebrecht, a paraplegic, brought a medical malpractice action against Drs. Tuli and Brunswick and Link Clinic (Tuli); Dr. Carlson and Christie Clinic (Carlson); and the Area E-7 Hospital Association, Mattoon Memorial Hospital (Memorial). Memorial was subsequently dismissed.

Plaintiff asserted defendants negligently failed to examine, appropriately test, diagnose, and treat her disc condition. As a result, by the time a myelogram was performed, plaintiff's 5/6 cervical disc had herniated and ruptured, causing a complete block of the spinal fluid. Because of the blockage, the pantopaque dye used in performing the test could not be removed. Plaintiff alleged she developed arachnoiditis and eventual paralysis as a result of the retained dye.

Defendants asserted they were not negligent and that the statute of limitations barred the action. A bifurcated trial was held. The jury returned a verdict in plaintiff's favor on the statute of limitations question and a separate jury returned a verdict for defendants on the negligence issue. Plaintiff appeals the negligence finding and defendants cross-appeal the statute of limitations finding.

We affirm.

Plaintiff raises eight principal issues on appeal: whether the jury's verdict is contrary to the manifest weight of the evidence; whether the trial court erred in admitting evidence about plaintiff's character and marital status, in applying Supreme Court Rule 212(b) (87 Ill. 2d R. 212(b)), in ruling that evidence of plaintiff's negligence was admissible, in allowing the defendants to cross-examine codefendants, in various rulings on expert testimony, in ruling on closing arguments and in instructing the jury.

Defendants raise four principal issues on cross-appeal: whether the trial court erred in denying defendants' motions for judgment notwithstanding the verdict; whether the trial court erred in certain evidentiary rulings, in instructing the jury, and in not sending an exhibit to the jury room.

FACTS

| Chronology 1977 | |
|---|---|
| March 8 | Plaintiff sees Dr. Tuli. |
| March 28 | Sees Dr. Freesmeier. |
| April 3 | Sees Dr. Patari. |
| April 5 | Sees Dr. Carlson. |
| April 5 | Sees Dr. Allen. |

| April 6 | Sees Dr. Brunswick. |
| April 7 | Admitted to Memorial. |
| May 3-23 | Treated by Dr. Sanders. |
| June 6 | Sees Dr. Weiss. |
| June 8 | Myelogram performed. |
| June 9 | Dr. Grubb performs laminectomy. |
| September 14 | Dr. Grubb diagnoses arachnoiditis. |

MARCH 8

Dr. Kasturi Tuli, a board certified internist, testified that he examined plaintiff in his office. Plaintiff's presenting complaints were neck pain—of one week's duration—with joint stiffness in the mornings. Tuli reviewed plaintiff's medical history of cancer and heart disease. He performed a physical which revealed tenderness in plaintiff's neck and swollen fingers. Tuli considered tenderness subjective.

Tuli testified further that he performed a screening neurological examination of plaintiff's upper extremities, which consisted of testing for weakness and deep tendon reflexes. All his findings were normal. Tuli did not do a sensory examination. His examination was tailored to the plaintiff's presenting complaints, and he diagnosed plaintiff's condition as arthritis or osteoarthritis. He prescribed moist heat with medication to relieve muscle spasms. Tuli noted no psychological factors and was sure he told plaintiff to return if her condition worsened.

On cross-examination after testifying in his own behalf, Tuli stated he did not believe plaintiff had a herniated disc when he saw her. Tuli learned how to do a complete neurological examination in medical school.

Plaintiff testified she had numbness on March 8, 1977, and her pain was nagging.

MARCH 28

Plaintiff testified she saw Dr. Freesmeier, a chiropractor, because her pain was worse. She began experiencing numbness in her fingers and tingling. Freesmeier's fee was too high, so plaintiff received no treatment.

APRIL 3

Plaintiff testified that her pain was very bad and she went to Memorial's emergency room.

Dr. Kristrall Patari, board certified in family practice and board eligible in neurology, testified that he examined plaintiff in the emer-

gency room on April 3, 1977. Plaintiff complained of pain of three weeks' duration, but he found no objective indications of neurological problems. Patari performed a screening neurological examination of plaintiff concentrating on her upper extremities because she complained of neck pain. His examination consisted of checking plaintiff visually and checking her range of neck motion and for weakness, atrophy, and strength. Patari's records indicate plaintiff had a "functional overlay" or highly emotional pain response.

Patari further testified he did a pinprick and light touch sensory examination but found no objective indications of disc pathology. Objective indications are changes in reflexes, sensation or strength. Complaints of numbness or pain are not significant, absent positive findings.

Patari diagnosed plaintiff's condition as tension headache. He prescribed tranquilizers and a muscle relaxant.

APRIL 5 (MORNING)

Dr. Milton Carlson, board certified in orthopedic surgery, testified that he examined plaintiff in his office. Plaintiff's presenting complaints were pain in her neck, shoulders and upper arms of approximately two months' duration. She did not report pain or paresthesia in the lower arms. Plaintiff reported numbness, but Carlson considered numbness subjective. Plaintiff reported that she had trouble sleeping, had been told she had arthritis, had been prescribed tranxene, and had seen a chiropractor. Plaintiff told Carlson she thought she might be depressed.

Carlson performed a screening neurological examination of plaintiff's upper extremities which showed no abnormalities. He reviewed plaintiff's records. He noted plaintiff had a "flat affect" or a nonemotional appearance which is consistent with depression. Depression can cause or alter a person's perception of pain.

Carlson further testified that since he could not determine the cause of plaintiff's pain and thought that she might be depressed, he referred her to a psychiatrist for consultation. Although he did not make a specific return appointment for plaintiff, his record said "PRN" which means return as needed. Carlson was sure he told plaintiff to return if her condition worsened and that he would see her after the consultation. He did not see plaintiff again.

On redirect, in retrospect, Carlson agreed that plaintiff had a herniated disc when he saw her.

Plaintiff testified she had no intention of seeing Carlson or a psychiatrist because she knew her pain was real. Carlson never told her

to return.

### APRIL 5 (EVENING)

Plaintiff testified the pain was acute and she returned to Memorial's emergency room. Dr. Stephen Allen, board certified in emergency medicine, testified he examined plaintiff in Memorial's emergency room. Plaintiff's presenting complaints were pain in the back of her neck and down her right arm. Allen conducted a screening neurological examination which resulted in no abnormal findings.

### APRIL 6

Dr. Wilfred Brunswick, board certified in internal medicine, testified that he examined plaintiff in his office. Plaintiff's presenting complaints were pain in her neck, shoulders and top half of her back of approximately six weeks' duration. Plaintiff complained of numbness in her hand, two weeks before the examination. Brunswick thought it was transient numbness but did not record it as such.

Brunswick further testified that he reviewed plaintiff's records, which showed she had experienced neck and back pain before, checked her reflexes, and checked for weakness. He found a marked spasm in plaintiff's neck. Although he noted plaintiff was divorced, he attached no significance to it. He concluded plaintiff might have degenerative joint disease. He renewed her pain medication. Plaintiff did not tell him of her visit to Carlson.

Brunswick testified degenerative joint disease may cause disc herniation without trauma. Although plaintiff's symptoms may indicate disc pathology, when he saw her, she had no objective indications of disc pathology. Brunswick did not plan traction, a myelogram, or other treatment.

### APRIL 7

Plaintiff returned to the emergency room and was admitted.

### APRIL 8-12

Brunswick testified he next saw plaintiff in Memorial on April 8; she had been admitted as his patient the night before. Brunswick performed a neurological examination which included: checking facial strength, cranial nerves, deep tendon reflexes, strength, and checking sensation with light touch. Brunswick testified he checked plaintiff's gait, had her do a finger-to-nose test, and had her do rapidly alternating movement tests. The results were all within normal ranges.

Brunswick did not check temperature, vibration, or position sense,

nor did he do a pinprick examination or check strength with a dynamometer. He had plaintiff squeeze his fingers instead. Brunswick's tests showed no objective indications of disc pathology. All his records stated was that neurological deep tendon reflexes were normal, strength grossly normal.

Brunswick further testified that nursing and physiotherapy notes indicated that plaintiff had difficulty cutting her food, had an unsteady gait and pain. Brunswick could not remember reading the notes while plaintiff was hospitalized. Although these symptoms are objective indications of disc pathology if they are related to weakness, he thought they were not in this case.

Brunswick tested and examined plaintiff several times during her hospital stay and all his results were negative. On April 12, Brunswick spoke to plaintiff in the physiotherapy room. He told plaintiff in the presence of others that her test results were negative and suggested she stay in the hospital to consult a psychiatrist. Brunswick did not remember if plaintiff reacted negatively. At that time he had no other plans for treating plaintiff.

In retrospect, Brunswick stated he agreed that a myelogram was necessary. However, he was certain that if plaintiff had a herniated or extruded disc he would have found objective indications of it with his tests.

Plaintiff testified she checked herself out of the hospital on April 12. She was upset and angry with Brunswick and felt his diagnosis was wrong. She had no intention of consulting a psychiatrist because her pain was real and not imaginary. Brunswick did not perform the neurological examination that he said he did.

### MAY 3-23

Plaintiff testified she was examined and treated by Dr. Walter Sanders, a chiropractor, who was the first to do a complete neurological examination. Her condition worsened during this time. Dr. Sanders testified he examined and treated plaintiff conservatively from May 3 to May 23. He said he did not do a complete neurological examination and thought plaintiff's condition stayed the same.

### JUNE 6

Plaintiff testified she was examined by Dr. Stuart Weiss, a neurologist. Weiss did a complete neurological examination and admitted plaintiff to Barnes Hospital in St. Louis. A myelogram was performed on June 8 and a laminectomy on June 9. Plaintiff improved after the laminectomy, but developed problems in August and September.

SEPTEMBER 15

Plaintiff underwent a second myelogram which revealed arachnoiditis, a weblike growth over the outer layer of the spinal cord which cuts off nerve signals.

PLAINTIFF'S EXPERTS:

*Dr. Elizabeth Kessler,* a board-certified neurologist, testified that the standard of care required a complete neurological examination, testing as many sensory and motor pathways to the brain as possible, when a patient presents complaints of neck pain and numbness.

Kessler testified that all defendants deviated from the standard of care by not performing a complete neurological examination of plaintiff. Additionally, Kessler testified Brunswick deviated from the standard of care by failing to: recognize the classic symptoms of disc pathology, refer to the hospital notes, consult a neurologist, order appropriate tests, or adequately make provisions for follow-up visits. A myelogram was indicated.

Kessler stated that psychiatric referral was inappropriate. Psychiatric referrals delay treatment and psychiatrists generally assume physical problems have been ruled out.

Kessler testified that there was a direct causal connection between defendants' failure to adequately diagnose and treat plaintiff's condition and her subsequent development of arachnoiditis. Plaintiff's disc had protruded against the spinal cord and by the time a myelogram was performed, a complete blockage of the spinal fluid existed. The pantopaque dye used in performing the myelogram could not be removed because of the block. The longer the dye is left in place, the more likely a person will develop arachnoiditis. Kessler stated plaintiff did not have a completely blocked spinal canal on March 8, 1977.

On cross-examination, Kessler testified that doctors evaluate the mental status of patients to see if complaints may have a psychogenic origin. Carlson's records indicate that plaintiff may have been depressed. After a consultation, the treating and consulting physician determine a course of treatment. Delay in seeking treatment between April 12 and June 6, 1977, may have aggravated plaintiff's condition.

*Dr. Donald Miller,* a board-certified orthopedic surgeon, testified that the standard of care required Carlson to do a complete neurological examination of plaintiff on April 5, or refer plaintiff to a neurologist. Carlson deviated from the standard of care by not doing a complete motor and sensory examination.

Miller further testified that there is a direct causal connection between retained pantopaque dye and arachnoiditis. Good practice re-

quires removal of the dye. On cross-examination, Miller was impeached. Miller indicated Carlson was plaintiff's treating physician during her hospitalization at Memorial. Miller stated Carlson should have hospitalized plaintiff on April 5, ordered a myelogram, thermogram, Cat scan, and an electroencephalogram.

DEFENDANTS' EXPERTS:

FOR DRS. TULI AND BRUNSWICK:

*Dr. Robert Chapman*, board certified in psychiatry, testified that the standard of care did not demand a complete neurological examination of plaintiff. Neurological examinations are tailored to the patient's complaints. Brunswick complied with the standard of care in referring plaintiff to a psychiatrist. Psychiatrists do not automatically rule out physical causes of the patient's symptoms. Pain in the neck and shoulder can have psychogenic origins.

Chapman testified that he could not say to a reasonable degree of medical certainty that plaintiff was depressed because he had not personally examined her. He would do an evaluation first because a myelogram is a surgical procedure with risks. It was significant that two physicians (Carlson and Brunswick), operating independently of each other and without knowledge of the other's findings, thought a psychiatric consultation was necessary.

On cross-examination, Chapman testified all internists and orthopedic surgeons should know how to do a complete neurological examination. A screening examination does not include sensory tests. Someone should have performed a complete neurological examination on plaintiff, given her symptoms while hospitalized.

Chapman further testified that there is no direct causal relation between retained pantopaque dye and subsequent development of arachnoiditis. Arachnoiditis is a sensitivity reaction—either a patient reacts or does not. Chapman was impeached by use of his discovery deposition. In retrospect, assuming plaintiff's symptoms as indicated by the hospital records, plaintiff may have had a herniated disc on April 12, 1977.

The evidence deposition of *Dr. Robert L. Grubb*, plaintiff's neurosurgeon, was presented in its entirety by defendant Tuli. Grubb testified that he examined plaintiff on June 8, 1977. Based upon his neurological examination and the result of a myelogram, he concluded plaintiff had either a tumor or herniated disc at the C-6 level. The myelogram showed a complete or near-complete block of the spinal fluid at that point. Grubb could not say how long the block had been

present.

Grubb performed a laminectomy on June 9, and stated that he would have removed the dye, had the block not been near-complete.

Grubb did not have an opinion to a reasonable degree of medical certainty about the relation of retained pantopaque dye and arachnoiditis. Scientists have linked the condition to infection, surgery around the spine, and pantopaque dye. Plaintiff had no evidence of infection, and the arachnoiditis started in her lower back, not cervical area. Arachnoiditis may develop after a normal myelogram.

Grubb further testified that a neurological examination is variable. Although every doctor should know what a neurological examination consists of, different medical specialties have different concepts of a complete examination. Examinations are tailored to the results and the plaintiff's complaints and complete sensory examination is not routinely done. A neurological examination can take anywhere from five to 10 minutes to an hour.

Grubb said that numbness and pain may have psychological origins. If a physician suspects a patient's symptoms may have a psychological origin, psychiatric referral is appropriate. Depression could have caused plaintiff's symptoms. When a disc herniates without trauma, objective indicia may not immediately be evident. But once evident, the patient may rapidly deteriorate. Repeated examinations are often necessary.

*Dr. John Mullen,* a board-certified neurosurgeon, testified that the standard of care does not automatically require a complete neurological examination of a patient, testing as many sensory and motor pathways to the brain as possible, when a plaintiff presents complaints of neck pain and numbness. Neurological examinations are variable and tailored to the patient's complaint and results reached.

Mullen testified that Tuli's examination complied with the standard of care because most neck pain will resolve itself in time. Conservative treatment and advising the patient to return were appropriate. Brunswick complied with the standard of care because diagnosis is essentially a process of elimination and Brunswick's procedure of testing and eliminating obvious causes was correct.

Mullen believed no evidence of impingement on the spinal cord existed on April 12, 1977. He stated there was no direct causal link between retained pantopaque dye and arachnoiditis. Several events could have caused plaintiff's condition: (1) infection, (2) unknown, (3) trauma, (4) hemorrhage in the spinal canal, and (5) retention of pantopaque dye. Earlier surgery would not have made a difference with respect to arachnoiditis, which is a rare development.

On cross-examination, Mullen testified plaintiff had a bulging disc early in her treatment. Someone should have done repeated examinations of plaintiff, including sensory examinations, and the hospital notes suggest a disc problem. Mullen thought plaintiff may have been depressed. He testified that it would not have been a deviation from the standard of care for a physician not to depend upon or read nursing and physiotherapy notes in making a diagnosis. The weight given a chart entry depends upon the reliability of its maker and the doctor.

FOR DR. CARLSON:

*Dr. Robert Mussey,* a board-certified orthopedic surgeon, testified that the standard of care does not automatically require a complete neurological examination, testing as many motor and sensory pathways to the brain as possible, when a patient presents complaints of neck pain and numbness. Mussey testified a screening examination complied with the standard of care.

Mussey stated Dr. Carlson's examination complied with the standard of care. A myelogram was not indicated because plaintiff displayed no objective abnormalities. An examination of plaintiff's lower extremities was not indicated by her symptoms. Psychiatric referral and telling a patient to return were appropriate because of the observed indicia of depression.

Mussey testified that there is no set screening examination. The examination is tailored to the plaintiff's presenting complaints. If a screening examination reveals an abnormality, a complete examination should be done. Herniation of a bulging disc with resulting symptoms can occur very quickly. It was possible plaintiff had a bulging disc on April 5, 1977, but not severe enough to produce abnormalities in the screening examination.

Mussey further testified that retained pantopaque dye had been linked, but not proved, as a cause of arachnoiditis.

*Dr. Harry Bremer,* a board-certified neurologist, testified that Carlson's examination of plaintiff comported with the standard of care for an orthopedic surgeon in the area. A screening neurological examination was appropriate.

Bremer testified that a neurologist or neurosurgeon would do a more complete examination, but there is no set standard for a nonspecialist. The examination is tailored to the patient's presenting complaints. Since the screening examination revealed no abnormalities, a complete examination was not required.

On cross-examination, Bremer stated a complete neurological examination of plaintiff on April 5, 1977, could have shown more find-

ings than a screening examination. Bremer agreed in retrospect that plaintiff had a disc problem in April.

ISSUES

I. MANIFEST WEIGHT

■ Plaintiff argues that the jury's verdict is contrary to the manifest weight of the evidence and should be reversed. Defendants argue that, considering the entirety of the evidence, the jury's verdict is supported by the evidence. We find the jury's verdict sufficiently supported.

In a medical negligence action, plaintiff must establish the appropriate standard of care. Then, plaintiff must establish by affirmative evidence that defendant's conduct violated the standard of care and that defendant's lack of skill or care caused harm to plaintiff. (*Walski v. Tiesenga* (1978), 72 Ill. 2d 249, 256, 381 N.E.2d 279, 282; *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 423, 328 N.E.2d 301, 304-05.) Expert testimony is usually necessary to establish these factors. *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *Carman v. Dippold* (1978), 63 Ill. App. 3d 419, 379 N.E.2d 1365.

A jury's verdict should be set aside if it is contrary to the manifest weight of the evidence. Such verdict is contrary to the manifest weight of the evidence only if it is wholly unwarranted by the evidence or clearly the result of passion or prejudice. (*Ogg v. City of Springfield* (1984), 121 Ill. App. 3d 25, 42, 458 N.E.2d 1331, 1342.) A jury's verdict is not contrary to the manifest weight of the evidence when the evidence is conflicting and the jury resolved the conflict. *St. Gemme v. Tomlin* (1983), 118 Ill. App. 3d 766, 768, 455 N.E.2d 294, 296.

Here, expert testimony conflicted on everything: the applicable standard of care, whether defendants' conduct breached the standard of care, and whether plaintiff's arachnoiditis was causally related to defendants' actions. Plaintiff's experts testified that the standard of care required each defendant to perform a complete neurological examination, testing as many motor and sensory pathways to the brain as possible, when plaintiff or any patient presents complaints of neck pain and numbness. Defendants' experts testified exactly to the contrary. They stated a screening examination was all that was necessary. They also stated that examinations vary and are tailored to the patient's complaint and results reached.

Dr. Grubb, plaintiff's treating physician, stated that neurological examinations are variable and need to be done many times to ade-

quately correlate results. Grubb stated that a complete neurological examination is seldom done. The examination's detail depends upon the doctor's skill and the results of previous tests.

Plaintiff's experts testified that inadequately following the patient breached the standard of care. Defendants' experts testified to the contrary. Additionally, plaintiff's expert Kessler was impeached on this point by use of her discovery deposition. During discovery, Kessler stated telling a patient to return as needed complied with the standard of care.

Plaintiff's experts testified psychiatric referral breached the standard of care. Defendants' experts testified to the contrary. Additionally, Kessler was impeached on this point. During discovery, she stated a psychiatric referral by Carlson was appropriate, given plaintiff's emotional aspect. Grubb stated psychiatric referral was appropriate in many cases where a patient presented plaintiff's symptoms.

Plaintiff's experts testified failure to order a myelogram breached the standard of care. Defendants' experts testified to the contrary. Plaintiff's expert Miller testified that many tests should have been ordered for plaintiff on April 5, 1977. Defendant Carlson's expert Mussey testified that some of the tests named were not available in the area at that time or at the present time. Defendants' experts also stated a myelogram has many risks, among them arachnoiditis. A myelogram was not in order, given plaintiff's symptoms.

Plaintiff's experts testified Brunswick's failure to read the nursing notes was a breach of the standard of care. Defendants' expert Mullen testified to the contrary. He stated that the weight given a chart entry depends upon the reliability of its maker and the doctor. Finally, the experts disagreed on the causal relation between retained pantopaque dye and subsequent development of arachnoiditis. Plaintiff's experts testified there is a positive relation. Defendants' experts testified there is no proved relation between the two. Grubb stated the area is highly speculative. Though retained pantopaque dye has been linked to arachnoiditis, it is only one of the theories.

As is often the case in medical negligence actions, establishing the standard of care, defendants' breach of the standard of care, and resulting harm to plaintiff depended upon the credibility of expert testimony. Defendants' experts won the credibility contest. This court will not second-guess a trial jury on credibility matters. (*St. Gemme v. Tomlin* (1983), 118 Ill. App. 3d 766, 455 N.E.2d 294.) The verdict was supported by the evidence.

## II. PLAINTIFF'S CHARACTER AND MARITAL STATUS

Plaintiff argues that testimony about her character and marital status was irrelevant and highly prejudicial. Defendants argue the testimony was relevant and, if irrelevant, its admission was not prejudicial.

### A. PLAINTIFF'S SUPERVISOR

■ Dr. Tuli called plaintiff's former employer, Barbara Goodart, as a witness. Goodart stated that she talked to plaintiff before her divorce, thought plaintiff's physical condition was terrible, and that it was a mistake for plaintiff to be divorced.

Goodart was asked to relate the contents of a letter from plaintiff. Plaintiff's objections were overruled. Goodart responded "the letter was full of hate for me." This response was stricken. In response to another question, Goodart stated:

> "I felt almost immediately she had misunderstood what I had tried to talk to her about. She accused me of things in my past that were very unpleasant, and she hadn't done these things. At the time I had talked to her I also talked to her about the time she spent in our bar. I thought it was a mistake for her to be there with children and a husband and I—."

Plaintiff's objection was sustained. The jury was instructed to disregard the statement. Generally, character evidence is inadmissible when a party's character is not in issue. (*Hickey v. Chicago Transit Authority* (1964), 52 Ill. App. 2d 132, 139, 201 N.E.2d 742, 746.) Evidence is relevant when it tends to prove a fact in controversy or render a matter in issue more or less probable. Probability is tested in light of logic and experience. *Marut v. Costello* (1966), 34 Ill. 2d 125, 214 N.E.2d 768.

Plaintiff's mental state at the time she saw defendant doctors was in issue. She alleged psychiatric referral violated the standard of care. However, Goodart's testimony did not relate in any manner to plaintiff's mental state at the time she saw defendant doctors. The letter was written the morning after plaintiff's conversation with Goodart about the divorce. The conversation occurred two days before her divorce in February and her neck complaints began in March. The testimony was not relevant and was prejudicial.

However, all of the objectionable testimony was stricken from the record. Generally, prompt action by the trial court cures any error which occurs in admitting testimony. *Pyse v. Byrd* (1983), 115 Ill. App. 3d 1003, 1009-10, 450 N.E.2d 1374, 1374-75.

Plaintiff argues the trial court compounded the error present in Goodart's testimony by not permitting plaintiff to testify in rebuttal about the contents of the letter. Rebuttal evidence is evidence that explains, repels, or contradicts affirmative matters introduced by defendants. Allowance of rebuttal testimony is within the trial court's discretion. *Derrico v. Clark Equipment Co.* (1980), 91 Ill. App. 3d 4, 413 N.E.2d 1345; *Levenson v. Lake-To-Lake Dairy Cooperative* (1979), 76 Ill. App. 3d 526, 394 N.E.2d 1359.

Here, the proffered rebuttal testimony contradicted testimony which was stricken from the record. Further testimony by plaintiff about the contents of the letter would not have explained, repelled, or contradicted any matter successfully introduced by defendants. No error occurred here.

### B. MARITAL STATUS

Plaintiff argues that evidence about her divorce was irrelevant and prejudicial and its admission denied her a fair trial by destroying her character. Defendants argue plaintiff's domestic problems were relevant to her mental status. Even if irrelevant, plaintiff initiated introduction of the evidence on her domestic status.

In personal injury actions, evidence of plaintiff's domestic circumstances is generally not admissible. The danger is that the jury will decrease or increase an award to plaintiff based upon sympathy or prejudice. However, when the domestic circumstance of a party is relevant, it is admissible. (*Ross v. Pfeifer* (1976), 39 Ill. App. 3d 789, 350 N.E.2d 797.) Plaintiff asserted defendants Carlson and Brunswick did not comply with the standard of care in referring her to a psychiatrist. Therefore, plaintiff's mental state was in issue.

Defendant Carlson noted that when he saw plaintiff she seemed depressed. Brunswick noted in his social history that plaintiff was divorced and was supporting a family. Both plaintiff's experts and defendants' experts testified that domestic problems can cause tension and depression, which may cause symptoms similar to those reported by plaintiff. Evidence was conflicting on plaintiff's mental state during and immediately after the divorce proceedings which coincided with the onset and progress of plaintiff's symptoms. Evidence is relevant if it tends to prove or disprove a proposition in issue. (*Marut v. Costello* (1966), 34 Ill. 2d 125, 214 N.E.2d 768.) Here, plaintiff's marital status was relevant.

Even if admission of the testimony was error, it was not reversible error. Plaintiff first introduced testimony on her domestic circumstances. On direct examination her mother, her first witness,

stated plaintiff was married and had two children. On cross-examination, her mother stated plaintiff was divorced during the operative time. Plaintiff later testified about her hysterectomy, dyslexic son, and hyperkinetic daughter. Plaintiff's, as well as defendants', witnesses testified about plaintiff's state of mind and domestic circumstances.

### III. SUPREME COURT RULE 212(b)

■ Plaintiff argues that the trial court committed reversible error in allowing defendants to introduce Grubb's evidence deposition. Defendants had taken Grubb's deposition and introduced it in its entirety in their case in chief. Plaintiff maintains she should have been allowed to introduce the deposition as it was necessary for her case.

The language of Supreme Court Rule 212(b) does not set out the procedure for introducing a deposition taken by an opponent. (87 Ill. 2d R. 212(b)).) *Dobkowski v. Lowe's, Inc.* (1974), 20 Ill. App. 3d 275, 314 N.E.2d 623, sets forth the procedure:

> "Where a plaintiff desires to introduce into evidence an evidence deposition taken by the defendant, the proper procedure is for the plaintiff to ask the defendant in open court whether he intends to use the deposition in his case. If the defendant answers affirmatively, the plaintiff may not use the deposition in his case. If, after such an exchange, the defendant fails to introduce the evidence deposition, the plaintiff should be permitted to reopen his case for the purpose of introducing the deposition into evidence. If the defendant responds when questioned in open court that he does not intend to use the deposition, the plaintiff may introduce the deposition into evidence as a part of his case." 20 Ill. App. 3d 275, 279, 314 N.E.2d 623, 627.

The *Dobkowski* court reasoned this formula would prevent procedural unfairness. We agree. Supreme Court Rule 206(c) states that questioning of a deponent is conducted as if the deponent were testifying at trial. (87 Ill. 2d R. 206(c).) A plaintiff introducing defendant's deposition would have the advantage of cross-examining his own witness. The court in the instant case precisely followed the *Dobkowski* procedure. No error occurred.

Plaintiff argues that Illinois has in effect adopted Federal practice on evidence depositions. In Federal practice, either party may introduce the deposition of an unavailable deponent. (*Savoie v. La-Fourche Boat Rentals, Inc.* (5th Cir. 1980), 627 F.2d 722; Fed. R. Civ. P. 32.) But, Illinois practice and Federal practice are not identi-

cal. Illinois preserves the distinction between evidence and discovery depositions and also restricts the form of questioning by the deposing party.

### IV. PLAINTIFF'S NEGLIGENCE

■ Plaintiff argues she had no duty to follow the unreasonable advice of her physicians and, therefore, evidence of her negligence was improperly admitted. The instant case was tried under the doctrine of comparative negligence. (*Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886.) Evidence of plaintiff's negligence would act to diminish any damage award. (*Marcin v. Kipfer* (1983), 117 Ill. App. 3d 1065, 454 N.E.2d 370.) Defendants amended their answers to plaintiff's amended complaint, alleging that any damage award should be decreased by the proportion of injury attributable to plaintiff's actions. Evidence was presented that plaintiff contributed to her own injury by failing to follow her physicians' advice and recommendations and by the delay in obtaining medical care between April 12 and June 6, 1977.

Initially, before the jury reaches the question of damages, it must decide liability. Here, the jury returned a verdict in favor of defendants. It did not reach the damages issue; therefore, the issue is not pertinent to the appeal. *Hulsebus v. Russian* (1969), 118 Ill. App. 2d 174, 180, 254 N.E.2d 184, 187.

■ Additionally, plaintiff's argument assumes the issue. The reasonableness of defendants' advice and course of treatment was in issue. Plaintiff states the advice was unreasonable; so, she was not contributorily negligent in failing to follow it. However, plaintiff assesses reasonableness in light of events that occurred after June 6, 1977. Here, plaintiff did not rely upon her physicians' advice. She rejected it. Cases cited by plaintiff holding reliance does not constitute contributory negligence are not applicable. She testified her condition rapidly deteriorated between hospitalizations. She waited two weeks before contacting a chiropractor and delay in seeking additional medical attention was established. Kessler testified delay contributed—or may have contributed—to the severity of the disc condition. Evidence of plaintiff's contributory negligence was properly admitted.

### V. CROSS-EXAMINATION OF CODEFENDANTS

■ Plaintiff argues the trial court committed prejudicial error by allowing defendants to cross-examine codefendants when no adversity existed. Defendant Carlson cross-examined Tuli and Bruns-

wick after each had testified in his own behalf. Plaintiff did not object during the cross-examinations. Generally, failure to object at trial waives review of the issue. *Bosel v. Marriott Corp.* (1978), 65 Ill. App. 3d 649, 653-54, 382 N.E.2d 587, 591.

Early during the trial, plaintiff posed a general objection to defendants's cross-examining each other's witnesses and codefendants where no actual adversity existed. The court neither sustained nor overruled the objection, but stated that cross-examination of experts would be allowed but limited to matters on direct. This objection arguably preserves the issue. Therefore, we address the merits of plaintiff's argument.

No adversity was formulated in the pleadings. The defendants' defense strategies were consistent. However, it was in each defendant's interest to show that he reacted to plaintiff's varying symptoms in the correct manner. Each defendant needed to establish that his neurological examination, findings, and recommendations were adequate and appropriate.

■ Under the comparative negligence doctrine, the relative negligence of the parties is assessed. Each defendant's interests necessitated a shifting of the primary responsibility to another party and these situations created adversity. In addition, each defendant was trying to establish his freedom from negligence. The defendants' interests were adverse in fact if not on the pleadings. Cross-examination was proper. *Fornoff v. Parke Davis & Co.* (1982), 105 Ill. App. 3d 681, 689-90, 434 N.E.2d 793, 800.

### VI. RULINGS ON EXPERT TESTIMONY

Plaintiff argues that numerous errors—either individually or cumulatively—denied her a fair trial. Defendants assert no error occurred and, alternatively, argue that any error which occurred was not prejudicial. Plaintiff asserts three main categories of error: cross-examination on irrelevant matters, applicability of the locality rule, and admission of hearsay testimony.

### A. CROSS-EXAMINATION ON IRRELEVANT MATTERS

#### (1) KESSLER'S REVIEW OF FILES

■ Over plaintiff's objection, defendants asked Kessler how she started reviewing medical files. Kessler's answer was nonresponsive; then, it was in conflict with her answer during discovery. Due to the nature of expert testimony, great latitude is allowed in cross-examination to show interest, bias, or motive. (*Chicago City Ry. Co. v.*

*Handy* (1904), 208 Ill. 81, 69 N.E. 917; *Sanchez v. Black Brothers Co.* (1981), 98 Ill. App. 3d 264, 423 N.E.2d 1309.) In *Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 466 N.E.2d 210, the court held an expert may be asked about the frequency of referrals from the litigating counsel and the basis of his compensation.

In malpractice actions, the jury relies extensively on expert testimony and the believability of the expert is a crucial factor. Information which tends to show bias or interest affects the credibility of the expert. In the instant case, defense counsel sought to establish the origin of Kessler's relation to plaintiff's counsel. In discovery, Kessler stated she started reviewing files when attorney friends of her attorney husband asked if she would be interested in doing so. Testimony establishing that Kessler and her spouse were friends of the referring attorney or an attorney within the law firm would tend to establish interest or bias on her part.

Defense counsel did not inquire into collateral matters such as other lawsuits. Repeated questioning occurred because Kessler was nonresponsive to the initial question. Limitation upon cross-examination establishing interest or bias is within the trial court's discretion. (*Sanchez v. Black Brothers Co.* (1981), 98 Ill. App. 3d 264, 423 N.E.2d 1309; *McMahon v. Chicago City Ry. Co.* (1909), 239 Ill. 334, 88 N.E. 223.) The discretion was not abused here.

### (2) MILLER'S FREQUENCY OF TESTIFYING

█ Plaintiff argues that allowing questioning of Miller about the frequency of his testifying was reversible error. Prior to trial, the court denied plaintiff's motion *in limine* to restrict this line of questioning. At trial, defendants asked Miller how many times he had testified in malpractice actions. Miller responded "a few times," slightly more for plaintiffs than for defendants.

The court in *Sears* did not decide this precise issue. However, the *Sears* court noted with approval that other jurisdictions have held this type of inquiry is permissible as bearing on the experience of the expert in testifying. The court stated Illinois should allow this type of questioning. *Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 466 N.E.2d 210; *Wilson v. Stilwill* (1981), 411 Mich. 587, 309 N.W.2d 898; *Barrios v. Davis* (Tex. Civ. App. 1967), 415 S.W.2d 714.

The trial here occurred prior to the *Sears* decision. However, two courts had addressed a similar question. In *McMahon*, plaintiff's counsel asked defendant's expert how many times he had testified for streetcar companies. The expert's answer showed he had testi-

fied for both plaintiffs and defendants. The court held no reversible error occurred because plaintiff had not been hurt by the answers. In *Schoolfield v. Witkowski* (1964), 54 Ill. App. 2d 111, 203 N.E.2d 460, defendant asked plaintiff's expert how many times he had testified in the past year; then, whether he had testified only for persons seeking to gain money. The court noted the questioning was proper to show bias until the point where the expert was asked if he testified only for plaintiffs. Here, Miller's answers did not harm plaintiff, and the questions were phrased in a neutral fashion. Therefore, if any error occurred, it was harmless.

### (3) KESSLER'S OPINION ON PLAINTIFF'S CURRENT MEDICAL CONDITION

■■ Plaintiff argues Kessler's testimony was improperly characterized by defense counsel and the court committed reversible error in allowing cross-examination on the basis of Kessler's opinion. On direct, Kessler testified extensively about plaintiff's current condition. On cross-examination, Kessler stated her data came from conversations with plaintiff's attorney in addition to hospital records, depositions, and a letter from plaintiff's treating physician. The basis of an expert's opinion is properly brought out on cross-examination. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.) No error.

### (4) IMPEACHMENT OF PLAINTIFF'S EXPERTS

■■ Plaintiff next urges that the court committed reversible error by permitting improper impeachment of her experts. Impeachment matters are generally within the trial court's discretion. (*Tenenbaum v. City of Chicago* (1975), 60 Ill. 2d 363, 325 N.E.2d 607; *Wenzell v. MTD Products, Inc.* (1975), 32 Ill. App. 3d 279, 336 N.E.2d 125.) In order for deposition testimony to be admissible for impeachment purposes, it must contradict the witness' in-court statement on a material matter. *Law v. Central Illinois Public Service Co.* (1980), 86 Ill. App. 3d 701, 408 N.E.2d 74.

We have examined all of the instances plaintiff cites as examples of improper impeachment and we find no improper impeachment. During discovery, Kessler answered several questions with a yes or no answer, and a repetition of the question or its salient part. At trial, she stated she could not answer yes or no. She was then impeached. In only one instance were her deposition and trial answers arguably consistent. During deposition, Kessler answered a question with an explanation that did not repeat the question. This was arguably not inconsistent with her trial statement that she could not an-

swer with a flat yes or no. However, her statement that she could not answer the question at all was itself a change from her deposition testimony. Therefore, impeachment was permissible.

Plaintiff's experts' trial answers were inconsistent with their deposition answers. The questioning involved disputed areas. Impeachment of Miller concerned factors contained in a neurological examination. Impeachment of Kessler concerned adequate follow-up, when a psychiatric referral was appropriate, and whether plaintiff's records indicated psychiatric referral was needed. The trial court did not err in allowing impeachment. *Law v. Central Illinois Public Service Co.* (1980), 86 Ill. App. 3d 701, 408 N.E.2d 74.

### (5) YES-NO ANSWERS

■■ Plaintiff argues her experts were improperly restricted to yes-no answers on cross-examination. We find no merit in this contention. In each instance cited by plaintiff, the witness was instructed to answer yes or no, or say if he could not. No error.

### (6) TRIAL COURT'S BIAS

■■ Next, plaintiff argues the trial court was biased in defendants' favor. This bias evidenced itself in the court's treatment of the parties' experts. Plaintiff's assertion is premised upon the trial court's restricting plaintiff's experts to yes-no answers on cross-examination while not so restricting defendants' experts. Defense counsel tightly controlled cross-examination, disclaiming all nonresponsive answers. Plaintiff's counsel did not move to strike nonresponsive answers to ask that responses be limited to yes or no, if possible. In the single instance where plaintiff moved to strike a nonresponsive answer, the answer was responsive and the motion was denied. The record does not support plaintiff's assertion of bias in the trial court's control of expert testimony.

### B. THE LOCALITY RULE

■■ Plaintiff argues the trial court committed reversible error in allowing cross-examination of plaintiff's experts on their familiarity with the local standard of care. Initially, plaintiff objected only once during this line of questioning. That objection was that the question had been asked and answered. It was not to the subject matter of the questioning. Failure to object at trial ordinarily waives review of the issue. *Wenzell v. MTD Products, Inc.* (1975), 32 Ill. App. 3d 279, 336 N.E.2d 125.

In Illinois, a defendant doctor is required to exercise the same

skill and diligence as a good practitioner in the same or similar community. The term "locality" has no precise meaning but varies with the facts of the particular case. (*Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 653-54, 343 N.E.2d 589, 604.) The rule developed at a time when there was a substantial difference in opportunities for continued medical education between rural and urban practitioners. It was also a response to the lack of medical research centers available to rural practitioners and transportation difficulties.

Because of the inherent problem in having a physician in the same community testify that defendant physician did not comply with the standard of care, Illinois has modified the strict "same community" standard. (*Bartimus v. Paxton Community Hospital* (1983), 120 Ill. App. 3d 1060, 1066-67, 458 N.E.2d 1072, 1077-78; *Stogsdill v. Manor Convalescent Home, Inc.* (1976), 35 Ill. App. 3d 634, 343 N.E.2d 589.) However, it still adheres to the locality rule.

In *Chamness v. Odum* (1979), 80 Ill. App. 3d 98, 399 N.E.2d 238, the court held that the locality which applies to defendant should not be narrowed any further than necessary to promote its rationale. In that case, an out-of-State, urban chiropractor's testimony was sufficient to establish the chiropractic standard of care for a rural practitioner. The court noted the educational backgrounds of the expert and defendant were similar. The knowledge upon which the standard of care was predicated was common knowledge in the profession. 80 Ill. App. 3d 98, 108-09, 399 N.E.2d 238, 246-47.

Similarly, in the instant case, the standard of care was predicated upon common knowledge, and all doctors were board certified on a national level. Plaintiff argues that since the rationale for the rule was not present, the court committed reversible error in allowing cross-examination on familiarity with local practice. Whether the rationale for the rule was present or not, Illinois has not abrogated the locality rule and, therefore, cross-examination was proper.

### C. CHAPMAN'S HEARSAY

█ Between his deposition and trial, defendants' expert Chapman changed his opinion on the relation between retained pantopaque dye and arachnoiditis. At trial, he stated that arachnoiditis was an allergic reaction to the dye and the time the dye was left in place had no bearing on development of the condition. On cross-examination, Chapman stated he changed his opinion after discussion with a radiologist friend. On redirect, the following colloquy oc-

curred:

"MR. RECORD: *** What information you have considered, whether it's written or oral or whatever, that has led you to your opinion, please state it to the jury.

\* \* \*

THE WITNESS: I showed him the x-rays that were done at Brokaw Hospital, the myelogram and discussed his opinion as to what the findings were and we discussed the case and the social involvement of arachnoiditis. And, I asked him about the incidences and why he didn't use pantopaque anymore and why it was generally accepted not to use it anymore. And, in the course of that discussion I learned that—

MR. MADDUX: I object to that, your Honor.

THE COURT: Overruled.

THE WITNESS: A person can develop a reaction in arachnoiditis from the pantopaque even if the dye is removed after the examination."

Plaintiff argues this was impermissible hearsay testimony. Its admission constituted reversible error. Defendants argue that testimony was admissible as out-of-court data upon which the expert reasonably based his opinion. In *Wilson v. Clark* (1981), 84 Ill. 2d 186, 193-96, 417 N.E.2d 1322, 1326-27, *cert. denied* (1981), 454 U.S. 836, 70 L. Ed. 2d 117, 102 S. Ct. 140, Illinois adopted the Federal Rules of Evidence 703 and 705 (Fed. R. Evid. 703, 705).

An expert may, therefore, base his opinion on data not in evidence, including the opinions of others. The key is whether experts in the field ordinarily rely upon such data in forming their opinions. Cross-examination is the appropriate method of eliciting the basis of the opinion. The key issue is whether Chapman asked his radiologist friend his opinion on the merits of the case or on the effect of retained pantopaque dye. The latter information would be exactly the type of data encompassed by *Wilson*. In *Denny v. Burpo* (1984), 124 Ill. App. 3d 73, 463 N.E.2d 1074, and in *Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 463 N.E.2d 216, the courts addressed similar questions.

In *Denny*, defendant's expert was cross-examined about his opinion regarding a statement contained in an authoritative publication. At trial, the expert stated he now agreed only in part with the statement since his conversations with the chief of neurology at Barnes Hospital. In a split decision, the Fifth District determined the statement was on the merits of the case and not the type of opinion on the medical procedure which is discoverable, subject to

cross-examination, and ordinarily relied upon in nontrial situations. Therefore, it was not within the purview of Federal Rules of Evidence 703 and 705 as adopted in *Wilson*. (*Denney v. Burpo* (1984), 124 Ill. App. 3d 73, 76-78, 463 N.E.2d 1074, 1076-78.) (The dissent believed the statement was admissible because it was reasonably relied upon by those in the field. 124 Ill. App. 3d 73, 78-80, 463 N.E.2d 1074, 1078-79 (Karns, J. dissenting).)

In *Mielke*, the Second District held an expert could not summarize the data and opinions of authors who researched the effect of a drug. The expert could testify about his opinion based upon the data within the articles but could not introduce the opinions and data of others. *Mielke v. Condell Memorial Hospital* (1984), 124 Ill. App. 3d 42, 56, 463 N.E.2d 216, 217.

Here, Chapman asked the radiologist a hybrid question about the merits of the case and arachnoiditis generally. He then changed his opinion accordingly. Under the Federal rules, this is acceptable if the out-of-court opinion is a type of data reasonably relied upon in non-litigation circumstances. See *Bauman v. Centex Corp.* (5th Cir. 1980), 611 F.2d 1115.

However, the rationale behind the *Wilson* decision was judicial economy and that the data was reliable and discoverable. Cross-examination was relied upon to test the validity of the expert's opinion. Here, Chapman could not be effectively cross-examined about the basis of his radiologist friend's opinion. To that extent the rationale behind *Wilson* does not apply. The testimony was therefore inadmissible hearsay.

But its admission did not constitute reversible error. The relation of pantopaque dye to arachnoiditis was a critical issue in the case. However, two experts other than Chapman stated that retained dye was implicated but not proved to be a cause of arachnoiditis. Chapman's testimony was cumulative. Error in the admission or exclusion of evidence is harmless if the facts involved are strongly established by other competent evidence. *St. Gemme v. Tomlin* (1983), 118 Ill. App. 3d 766, 770, 455 N.E.2d 294, 297; *Mohler v. Blanchette* (1982), 106 Ill. App. 3d 545, 553, 435 N.E.2d 1161, 1167.

## VII. RULINGS ON CLOSING ARGUMENTS

### A. DEFENDANTS' ARGUMENT

▮ Plaintiff alleges two errors by defendant Tuli in closing argument that denied her a fair trial. Plaintiff did not object to one

instance she complains of on appeal. Therefore, she waives review of the matter. (*Department of Transportation v. Roodhouse* (1982), 104 Ill. App. 3d 880, 884, 433 N.E.2d 703, 706; *Bosel v. Marriott Corp.* (1978), 65 Ill. App. 3d 649, 382 N.E.2d 587.) Plaintiff's objection to defendant's argument that it had to call Grubb as a witness was overruled.

 Generally, it is improper for a defendant to comment upon plaintiff's failure to call a witness who is not under plaintiff's control or who is equally available to the defendant. (*Foerster v. Illinois Bell Telephone Co.* (1974), 20 Ill. App. 3d 656, 315 N.E.2d 63.) The danger is that the jury will presume the testimony would have been unfavorable to the noncalling party. It is also improper for defendant to comment on plaintiff's failure to call a witness whom defendant calls. (*Brichacek v. Hampton* (1964), 54 Ill. App. 2d 284, 203 N.E.2d 737.) However, an attorney may argue the evidence and reasonable inferences from it. *Northern Trust Co. v. Skokie Valley Community Hospital* (1980), 81 Ill. App. 3d 1110, 401 N.E.2d 1246.

Here, the statement was made in the context of comparing and contrasting testimony presented on causation. Defendant pointed out that he presented Grubb's testimony, the only testimony on the progress of plaintiff's disc condition. This was exactly what occurred at trial. The argument was fair comment on the evidence. The trial court has wide discretion in ruling on the propriety of closing argument. (*Mohler v. Blanchette* (1982), 106 Ill. App. 3d 545, 435 N.E.2d 1161; *People v. Watson* (1982), 103 Ill. App. 3d 992, 431 N.E.2d 1350.) No abuse of discretion.

### B. PLAINTIFF'S ARGUMENT

 The jury was instructed that it could award future medical expenses. It was instructed to discount those expenses to their present cash value. In arguing damages, plaintiff multiplied an estimated yearly cost by plaintiff's life expectancy. The court asked plaintiff if the second figure was the final one and she stated that it was. The court sustained defendants' objection to the argument as a *per diem* one. On appeal, plaintiff argues the court committed reversible error because the argument was not a *per diem* argument on future pain and suffering.

We agree that the argument was not a *per diem* argument on future pain and suffering. (*Caley v. Manicke* (1961), 29 Ill. App. 2d 323, 173 N.E.2d 209, *rev'd on other grounds* (1962), 24 Ill. 2d 390, 182 N.E.2d 206.) However, no error occurred here. The argument misstated the instructions. Plaintiff's counsel did not argue discount-

ing the future medical expenses to their present cash value. The court in its inquiry focused on this problem. The court prevented counsel from misleading the jury. *Foerster v. Illinois Bell Telephone Co.* (1974), 20 Ill. App. 3d 656, 315 N.E.2d 63.

Additionally, the jury did not reach the damages question since it found defendants were not liable. Any error was harmless. *Hulsebus v. Russian* (1969), 118 Ill. App. 2d 174, 254 N.E.2d 184; *Guenther v. Hawthorn Mellody, Inc.* (1975), 27 Ill. App. 3d 214, 326 N.E.2d 533.

### VIII. INSTRUCTIONS

██ █ Initially, plaintiff objects to the trial court giving her own issues instruction. A party may not claim error from its own instruction. (*Misch v. Meadows Mennonite Home* (1983), 114 Ill. App. 3d 792, 795-98, 449 N.E.2d 1358, 1361-62.) Plaintiff next argues that instructing the jury on the effect of plaintiff's negligence was reversible error. This argument is premised on plaintiff's assertion that contributory negligence has no role in a wrongful diagnosis case. As discussed earlier, evidence of plaintiff's negligence was admissible. If believed, it would mitigate defendants' damages. Therefore, the instruction was proper. *Harris v. Day* (1983), 115 Ill. App. 3d 762, 451 N.E.2d 262; *Snyder v. Poplett* (1981), 98 Ill. App. 3d 359, 424 N.E.2d 396.

██ Finally, plaintiff argues that giving defendants' instruction on sole proximate cause was reversible error. But defendants presented evidence that arachnoiditis has causes other than retained pantopaque dye. Each party is entitled to instructions on matters supported by the evidence. (*Harris v. Day* (1983), 115 Ill. App. 3d 762, 451 N.E.2d 262; *Snyder v. Poplett* (1981), 98 Ill. App. 3d 359, 424 N.E.2d 396.) No error in instructing the jury.

CROSS-APPEAL

### I. JUDGMENT *N.O.V.*

██ The discovery rule, as applied to the statute of limitations, applied in this case. (Ill. Rev. Stat. 1975, ch. 83, par. 22.1; now Ill. Rev. Stat. 1983, ch. 110, par. 13—212; *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869.) Under the discovery rule, the statute of limitations starts to run when plaintiff knows or reasonably should know that she is injured and that the injury may have been wrongfully caused. At that time, plaintiff must inquire into the existence of a cause of action. (*Witherell v. Weimer* (1981), 85 Ill. 2d

146, 421 N.E.2d 869; *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 421 N.E.2d 864.) Whether a person knows or possesses sufficient information that he should reasonably know of an injury and the possibility that the injury may have been wrongfully caused is a question of fact. *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869; *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 421 N.E.2d 864.

Defendants argue that the trial court erred in denying their motion for judgment notwithstanding the verdict because the evidence showed that plaintiff subjectively knew the diagnoses were wrong and rejected them, and that her condition continued to deteriorate. Alternatively, defendants argue plaintiff reasonably should have known of her injury and the possibility of wrongful cause by April 12, or at least by May 23, 1978.

A judgment notwithstanding the verdict should be entered when all the evidence, viewed most favorably to the opponent, overwhelmingly favors the movant so that no contrary verdict could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

The facts are undisputed that plaintiff felt the diagnoses were wrong, rejected her physicians' advice, and knew her physical condition was deteriorating. In essence, defendants ask this court to rule as a matter of law that injury equals wrongful diagnoses plus worsening symptoms. Defendants then maintain subjective belief in wrongful diagnoses is sufficient to force plaintiff to inquire into possible wrongful causation.

Illinois courts have not clearly defined the above relation. Where traumatic injury occurs, plaintiff immediately has a duty to inquire as to whether a physician's actions may be the cause of the injury. (*Lutes v. Farley* (1983), 113 Ill. App. 3d 113, 446 N.E.2d 866; *Bates v. Little Company of Mary Hospital* (1982), 108 Ill. App. 3d 137, 438 N.E.2d 1250.) Knowledge of the injury is immediate because of its nature. Where the injury is an aggravation of a physical problem which may naturally develop, absent negligent causes, neither its existence nor potential wrongful cause may immediately be known. *Kaufman v. Taub* (1980), 87 Ill. App. 3d 134, 410 N.E.2d 114; *Martinez v. Rosenzweig* (1979), 70 Ill. App. 3d 155, 161, 387 N.E.2d 1263; *Roper v. Markle* (1978), 59 Ill. App. 3d 706, 375 N.E.2d 934.

The court in *Martinez* stated:

> "In a case involving an obvious physical harm, plaintiff should reasonably be able to know it was the result of another's act or omission. However, in instances like *Roper* and the present

case, the plaintiff may not be able to determine the true nature of his ailment or its cause. To interpret the discovery rule to allow a mere awareness of a physical problem to commence the running of the statute of limitations in all cases, without knowledge that it was possibly the result of another's negligence, would be unfair and unrealistic." (*Martinez v. Rosenzweig* (1979), 70 Ill. App. 3d 155, 161, 387 N.E.2d 1263, 1268.)

*Martinez* reviewed the propriety of a summary judgment order. However, it is factually similar to the instant case in that the plaintiff's symptoms could have occurred absent a negligent cause. Here, plaintiff knew her symptoms and knew her doctors were not correctly diagnosing their cause. She did not know the result of the misdiagnosis and the symptoms' cause until after June 6, 1977.

At what point plaintiff knew or should have known of an injury and its possible wrongful cause was a question of fact. (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869.) When viewed in a light most favorable to plaintiff, the evidence does not overwhelmingly favor defendants' assertion.

## II. EVIDENTIARY RULING

### A. DEFENDANTS' STATEMENTS

■ Defendants argue the trial court committed reversible error in admitting irrelevant evidence. On cross-examination, plaintiff asked each defendant whether he believed that he had injured the plaintiff. Defendants objected on relevancy grounds. In closing argument, plaintiff argued that she could not reasonably be expected to believe defendants had injured her when defendants did not believe they had.

Evidence is relevant where it tends to prove a fact in controversy or make a matter in issue more or less probable. Probability is determined in light of logic, experience, and accepted assumptions about human behavior. *Marut v. Costello* (1966), 34 Ill. 2d 125, 214 N.E.2d 768; *Caley v. Manicke* (1961), 29 Ill. App. 3d 323, 173 N.E.2d 209; *Phillips v. Lawrence* (1967), 87 Ill. App. 2d 60, 230 N.E.2d 505.

Plaintiff's state of mind was the key element in the statute of limitations portion of the trial. The focus was whether plaintiff knew or reasonably should have known of her injury and that it might have been wrongfully caused before June 6, 1977. During the operative time, defendants did not articulate their belief that they had not

harmed plaintiff. Defendants' unspoken beliefs could not logically have influenced plaintiff's state of mind. The evidence was not relevant. However, under the facts presented here its admission was not reversible error. *St. Gemme v. Tomlin* (1983), 118 Ill. App. 3d 766, 455 N.E.2d 294.

## B. PLAINTIFF'S TREATMENT AFTER JUNE 5, 1977

■■ Defendant Carlson argues the trial court committed reversible error by allowing plaintiff to testify about her medical experiences after June 5, 1977. This argument is without merit. The testimony complained of was part of an offer of proof out of the jury's hearing. The offer was not accepted. No error.

## C. MISCELLANEOUS JURY INSTRUCTIONS

■■ Defendants next argue reversible error occurred in instructing the jury. We find no error. Initially, defendant Tuli argues that one of its issues instructions should have been given rather than plaintiff's issue instruction. Tuli proposed two instructions which were modified forms of Illinois Pattern Jury Instructions, Civil, No. 20.01 (2d ed. 1971). Defendant's instructions incorrectly stated the issues in the case. Therefore, they were properly refused. *Shore v. Turman* (1965), 63 Ill. App. 2d 315, 210 N.E.2d 232.

In the statute of limitations portion of the trial the issue was whether plaintiff knew or reasonably should have known of an injury and its possible wrongful cause before June 5, 1977. Instruction 13's introductory language stated, "In this lawsuit, plaintiff claims she was injured and sustained damages from medical care and treatment." This is not a correct statement of the issue. Instruction 13(a) omitted the subjective portion of the test. It incompletely stated the issue.

Defendant Tuli next argues his burden of proof instruction should have been given. This instruction paralleled the issues instruction and contained the same problems.

■■ Finally, defendant Tuli argues that a different definitional instruction of injury should have been given to the jury. Tuli's instruction 17(b) was given. A party cannot assert reversible error occurred as the result of its own instruction. *Misch v. Meadows Mennonite Home* (1983), 114 Ill. App. 3d 792, 449 N.E.2d 1358.

■■ Defendant Carlson argues the trial court committed reversible error when it refused to instruct the jury that the rights of each defendant should be considered separately. The jury was instructed that if it found plaintiff knew or should have known of an injury and

possible wrongful causation before June 5, 1977, then it should return a verdict in favor of all defendants. Once plaintiff is on notice as to one defendant's negligence, she has a duty to inquire about other potentially negligent parties. (*Urchel v. Holy Cross Hospital* (1980), 82 Ill. App. 3d 1050, 403 N.E.2d 545.) Carlson's verdict form would have allowed the jury to reach inconsistent verdicts contrary to the applicable law. It was properly refused.

 Defendant Carlson next argues that his definitional instruction should have been given rather than defendant Tuli's. Carlson's instruction states:

"When I use the phrase 'injury and that it may have been wrongfully caused' in these instructions I mean evidence of a physical problem that may have been caused by or resulted from misdiagnosis or improper treatment."

This instruction did not fit the facts and pleadings of the case. Plaintiff did not allege that the evidence of her physical condition was caused or resulted from misdiagnosis. The facts did not support the assertion that misdiagnosis caused the indicia or symptoms of disc problems. Instructions should accurately state the issues and define the terms in light of the pleadings and facts of the case. The definitional instruction did not do so and was properly refused. *Shore v. Turman* (1965), 63 Ill. App. 2d 315, 210 N.E.2d 232.

 Both defendants finally argue that the trial court abused its discretion in not further defining injury for the jury. During deliberations, the jury sent this question to the court:

"Please Define: Condition of Ill-Being."

The court responded:

"The Court has received your written question. You have heard the evidence and received the instructions of law which apply to the case. Please continue to deliberate."

A trial court may properly give a supplementary instruction to the jury to clarify existing confusion. (See *Misch v. Meadows Mennonite Home* (1983), 114 Ill. App. 3d 792, 449 N.E.2d 1358; *People v. Kucala* (1972), 7 Ill. App. 3d 1029, 288 N.E.2d 622.) In some instances, the court's action may prevent error from occurring. *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223.

Here, the jury's question did not indicate confusion. The jury focused on a critical matter—what elements were included in a "condition of ill-being." A previous instruction equated injury with a condition of ill-being. Clarification would have in effect decided the ultimate issue in the case. Since the jury was adequately instructed,

no abuse of discretion occurred.

#### IV. RELEASE FORM

Defendant Tuli argues the trial court committed reversible error by not sending a release form to the jury room. The form was in evidence as an illustrative sample of plaintiff's handwriting. A trial court has great discretion in deciding which exhibits may be taken into the jury room. (*Wetherell v. Matson* (1977), 52 Ill. App. 3d 314, 367 N.E.2d 472.) Here, the exhibit's contents were prejudicial to the plaintiff and were legally ineffective to release Brunswick and Memorial from liability. The possibility of confusing and prejudicing the jury existed. No abuse of discretion occurred.

For the foregoing numerous reasons, we affirm the trial court.

Affirmed.

GREEN, P.J., and TRAPP, J., concur.