CINDY R. TROWER *et al.*, Plaintiffs-Appellants, v. GRANT A. JONES, Defendant-Appellee.

Fourth District   No. 4—86—0137

Opinion filed November 24, 1986.—Rehearing denied December 19, 1986.

Gregory E. Pelini, of Pelini & Sheffler, of Champaign, for appellants.

Richard F. Record, Jr., and Paul R. Lynch, both of Craig & Craig, of Mattoon, for appellee.

JUSTICE MORTHLAND delivered the opinion of the court:

Plaintiffs brought a medical malpractice action in the circuit court of Douglas County seeking damages from defendant doctor. The jury returned verdicts in favor of the doctor, and the court entered judgment on the verdicts. Because plaintiffs on appeal raise questions concerning the admissibility of certain evidence and the sufficiency of all the evidence, a detailed description of the facts follows.

Plaintiffs, Cindy R. Connour and Donald E. Connour, filed a two-count complaint in the circuit court of Douglas County against defendant, Grant A. Jones, M.D. Count I alleged that Dr. Jones was negligent in his medical treatment of Cindy and sought damages. Count II alleged that as a result of Dr. Jones' negligent treatment of Cindy, Donald suffered the loss of Cindy's society and sought damages. Following the dissolution of plaintiff's marriage, the caption was amended to change the name of Cindy R. Connour to Cindy R. Trower. The following testimony was elicited at trial.

Cindy testified that she was married to Donald on June 5, 1977, and divorced on June 5, 1984. After describing her work history,

Cindy stated that Dr. Jones was her family physician.

While at work on March 3, 1981, Cindy began experiencing nausea and pain in her abdomen. She was vomiting and suffering from diarrhea. Cindy left work, and she was eventually taken to Dr. Jones' office in Arthur. Cindy explained her symptoms to Dr. Jones' nurse and to Dr. Jones himself. Dr. Jones examined Cindy by pressing on her stomach and listening to her heart. Dr. Jones asked Cindy if she was taking any drugs, and she responded that she takes birth control pills. Cindy was asked by Dr. Jones to give him a urine specimen, but she was unable to do so. Cindy stated that she was given a shot and a prescription for medicine. Cindy was told that she was suffering from a virus which would run its course in 48 hours. The prescription was filled, and Cindy took the medicine as directed.

On March 4, 1981, Cindy did not return to work because her symptoms persisted. She went to Jarman Hospital to receive a shot which was approved by Dr. Jones. Cindy was still unable to produce a urine specimen.

On March 5, 1981, Cindy's condition worsened, and she did not return to work. In the afternoon a urine specimen was delivered to Dr. Jones' office.

On March 6, 1981, Cindy did not return to work. In the evening the pain in her abdomen became more severe. Cindy was taken to the emergency room at Jarman Hospital where Dr. Sands performed a vaginal examination and a pelvic examination. Cindy had a bloody vaginal discharge, and Dr. Sands told her that he thought she might have an ectopic pregnancy. Cindy was admitted to Jarman.

On March 7, 1981, Cindy's symptoms persisted. Dr. Jones visited her in the hospital and told her that her pregnancy test was positive. Dr. Jones examined Cindy's stomach and listened to her heart. No other tests or examinations were performed that day.

From March 8, 1981, to March 13, 1981, the date of Cindy's discharge from Jarman, Dr. Jones visited her on a daily basis. Other than pressing on her stomach and listening to her heart, Dr. Jones performed no tests or examinations. On March 10, 1981, Joyce Martin, Dr. Jones' assistant, performed a vaginal examination. On different occasions, Cindy was told by Dr. Jones that her pregnancy test had been positive and then negative. No physicians other than Dr. Jones visited her during her hospitalization. On March 11, 1981, Cindy told Dr. Jones that her symptoms had become less severe and that she wanted to go home. On March 13, 1981, Cindy was discharged and given a prescription, which was filled and taken as directed.

On March 19, 1981, Cindy's symptoms persisted, and she visited Dr. Jones at his office. Dr. Jones pressed on Cindy's stomach and listened to her heart but performed no other tests or procedures. Cindy was given a prescription which was filled and taken as directed.

Cindy visited Dr. Jones' office again, but could not recall the date or details of the visit.

On April 2, 1981, Cindy visited Dr. Jones at his office. Cindy told Dr. Jones that she was weak and had been vomiting. No tests or examinations were performed. Dr. Jones released Cindy to return to work.

On April 3, 1981, Cindy did not return to work because her symptoms persisted. She was taken to visit Dr. James Laidlaw of Christie Clinic, who performed a rectal examination and a pelvic examination. Dr. Laidlaw inserted a syringe into Cindy's vagina and withdrew some green pus.

Cindy was immediately admitted to Mercy Hospital. Her attending physician at Mercy was Dr. Laidlaw. While at Mercy, an ultrasound examination, a pelvic examination, and an operation were performed. Cindy was told that the operation was a colostomy. Cindy described the colostomy as a procedure in which bags were attached to the outside of her body to collect discharge from her upper intestinal tract. Cindy described the procedures she had to take to care for the colostomy. Cindy was in Mercy for approximately three weeks. Although some of her symptoms persisted, she began to feel better. After being discharged from Mercy, Cindy was unable to return to work or to do housework.

On May 12, 1981, Cindy returned to Mercy to have the colostomy reversed. She remained under the care of Dr. Laidlaw and Dr. Fischer. Cindy described the procedures performed on her in preparation for the colostomy closure. The colostomy closure was performed on May 23, 1981, and Cindy was discharged from Mercy on May 30, 1981. Some of Cindy's symptoms persisted. She was feeling like herself again within two weeks of her discharge. Cindy visited Dr. Laidlaw on several occasions after her discharge.

During April 1982, Cindy returned to Mercy Hospital where her left fallopian tube and ovary were removed. Her recovery period lasted six to eight weeks, during which time she was very sore.

Since her illness, Cindy has been unable to conceive a child. She is no longer experiencing the difficulties she had in March 1981, and she is no longer under any limitations.

On cross-examination Cindy admitted that she was a little "fuzzy" on some of the details of her first visit to Dr. Jones' office. She also

admitted telling Dr. Jones that she was feeling better towards the end of her hospitalization at Jarman. Cindy also discussed notes she had taken of her illness. She also answered questions about her marriage and divorce and about her work history during and subsequent to her illness.

On redirect examination, Cindy stated that she returned to work for a short period of time in July 1981 under Dr. Laidlaw's orders.

Donald Connour testified regarding his marriage to, and divorce from, Cindy. He also testified that during Cindy's hospitalization at Jarman, she would sometimes indicate that she was feeling better, but she would sometimes be so sick that she could not talk to him. He testified that he had to assume more household responsibilities during Cindy's illness and that her illness placed a strain on their marriage. Cindy was back to normal mid-1982.

On cross-examination Donald stated that he was 20 and Cindy was 16 when they were married. He also testified that Cindy appeared to feel better on some days following her discharge from Jarman and that she even said so.

Jane Trower, Cindy's mother, testified as to Cindy's medical history. She stated that Cindy appeared ill on every occasion she visited her at Jarman. Also, Cindy "didn't look good" after her release from Jarman. Cindy gradually returned to her normal self within one year of her second surgery at Mercy.

Lawrence Trower, Cindy's father, testified that Cindy appeared sick during her hospitalization at Jarman. She was pale and looked as if she was losing weight and nauseated. Cindy began looking better eight to nine months later.

Harold Loy, the plant supervisor at Cindy and Don's place of employment, testified as to Cindy's work habits and job duties prior to March 1981 and the events of March 3, 1981, when Cindy became ill at work. Loy testified that Cindy returned to work on July 13, 1981, and left again on March 3, 1982. She returned again on August 8, 1983, and left again on May 5, 1984. When Cindy returned, she was unable to perform her job duties as well as she had prior to March 1981.

Helen Hood, Cindy's aunt, recalled the events of March 3, 1981, when she took Cindy to Dr. Jones' office.

Bonnie Ray, Cindy and Don's former next-door neighbor, testified that prior to March 1981 Cindy appeared healthy. During the first few days of Cindy's illness, she appeared pale, thin, and weak. When Ray visited Cindy at Jarman, "she seemed better than what she was when she was at home." After returning home from Jarman, Cindy still ap-

peared sick. After her colostomy closure, Cindy appeared healthy again.

On cross-examination defendant's counsel emphasized Ray's statement regarding Cindy's appearance at Jarman.

June Connour, Cindy's former mother-in-law, who also worked at Cindy and Don's place of employment, described Cindy's work duties and recalled the events of March 3, 1981, and subsequent events. She stated that Cindy returned to normal six weeks after the colostomy closure.

Dr. Jones was called to testify as an adverse witness. Dr. Jones described his education and professional background, stating that he had been a general practitioner in Arthur since 1948. He had treated Cindy since she was a child for mostly common illnesses and injuries.

On March 3, 1981, Cindy was brought to Dr. Jones' office. He was told that she had been vomiting and that she was suffering from mild soreness across her abdomen. Dr. Jones palpated her abdomen and auscultated her chest and abdomen. Her bowel sounds were normal. Although Cindy was requested to provide a urine specimen, she was unable to do so. Dr. Jones performed no other diagnostic tests. Dr. Jones diagnosed Cindy's condition as mild cystitis (a bladder infection) and prescribed Amoxicillin (an antibiotic designed to reduce inflammation).

On March 4, 1981, Cindy's mother called Dr. Jones to schedule an appointment for Cindy. Because they were unable to schedule an appointment for a mutually convenient time, Dr. Jones arranged for Cindy to receive Dramamine at Jarman.

On March 5, 1981, Cindy brought in a urine specimen. The urine was clear, and there was no increased number of white blood cells. All tests performed on the specimen were negative. Dr. Jones then determined if Cindy had been suffering from cystitis, it had cleared up due to the medication.

On March 6, 1981, Dr. Jones was informed that Cindy had entered Jarman. Dr. Sands contacted him and told him that Cindy might have pelvic inflammatory disease (p.i.d.) (an infection of the fallopian tubes which can cause sterility). Dr. Sands also told Dr. Jones that test results showed that Cindy had a high white blood cell count (22,000), indicating a severe infection. Dr. Sands revealed that the results of a pregnancy test were positive. Dr. Jones stated that the use of birth control pills can sometimes cause a positive pregnancy test. Dr. Sands and Dr. Jones discussed the tests to be performed on Cindy. Dr. Sands indicated that Cindy was "spotting." Due to the possibility that Cindy was pregnant, Dr. Jones cancelled the chest X ray

which had been ordered by Dr. Sands.

On March 7, 1981, Dr. Jones visited Cindy at Jarman. Cindy appeared ill and complained of vomiting and pain in her abdomen. Dr. Jones palpated Cindy's abdomen and auscultated her chest. Her abdomen was distended, and her bowel was not functioning. Dr. Jones diagnosed Cindy's condition as severe peritonitis (a condition caused by an infection reaching the peritoneum end). Peritonitis is an effect rather than a cause and can be caused by diseases such as p.i.d. and gastroenteritis. Dr. Jones continued treating Cindy with Ampicillin.

On March 8, 1981, Dr. Jones, accompanied by Dr. Sands and Joyce Martin, Dr. Jones' physician's assistant, visited Cindy. Cindy was still vomiting and suffering from pain in her abdomen. A pregnancy test was repeated, and the result was negative. No other tests were performed or ordered. Dr. Jones believed the cause of the peritonitis to be p.i.d., appendicitis, or gastroenteritis.

On March 9, 1981, Dr. Jones visited Cindy. She was vomiting less, she was suffering from less pain, and her abdomen was no longer distended. Dr. Jones believed the peritonitis was subsiding. Joyce Martin performed a pelvic examination. The results of the pelvic exam showed that Cindy had a clear cervix, that her muscles were tender, and that there was no vaginal discharge. A culture was taken which resulted in a negative finding. No other tests were performed. The pelvic examination performed by Martin also indicated that Cindy had tenderness in the adnexal region (fallopian tubes and ovaries), which reinforced Dr. Jones' diagnosis of peritonitis. Later Dr. Jones testified that Martin had indicated that there was too much muscle rigidity to form conclusive findings from the pelvic examination.

On March 10, 1981, Dr. Jones visited Cindy and determined that her condition was improving. Cindy was vomiting less and her abdomen was less tender, indicating that the peritonitis was subsiding. No diagnostic tests were ordered or performed. Dr. Jones changed Cindy's medication from Ampicillin to Kaeflex. Dr. Jones acknowledged that the negative results of the culture indicated that Cindy was suffering from an internal infection of the cervix. P.i.d. is an internal infection of the cervix. Dr. Jones no longer believed that appendicitis was the cause of Cindy's peritonitis.

On March 11, 1981, Cindy had developed severe diarrhea, indicating to Dr. Jones that she had an irritated bowel. Dr. Jones palpated her abdomen and auscultated her chest and abdomen, but he performed no other tests or procedures. Although a laparoscope could have been used to detect the presence of a pelvic abscess, Dr. Jones did not utilize a laparoscope. Dr. Jones diagnosed Cindy's probable

condition as gastroenteritis, but he could not rule out p.i.d.

Although Cindy's vomiting and diarrhea persisted on March 12, 1981, she told Dr. Jones that she was feeling better and wanted to go home. Dr. Jones performed the usual physical examination on Cindy and arrived at the conclusion that the peritonitis was practically gone. He still believed the cause to be gastroenteritis (an inflammation of the bowel), but he could not rule out p.i.d.

On March 13, 1981, Dr. Jones palpated Cindy's abdomen and determined that the peritonitis had disappeared clinically. Cindy had not vomited or suffered abdominal pain during the preceding 24 hours. Dr. Jones believed that Cindy was well enough to go home, and he discharged her from Jarman. He gave her a prescription for Kaeflex and told her to visit his office one week later. Dr. Jones diagnosed Cindy's condition as gastroenteritis. Had p.i.d. been the cause of the peritonitis, Dr. Jones stated that he would have felt a mass in Cindy's abdomen, which he had not.

On March 19, 1981, Cindy visited Dr. Jones' office. Dr. Jones had no record of any complaints from Cindy, and he did not perform any tests other than the usual physical examination. Dr. Jones gave Cindy a prescription for Amoxicillin and told her to return in one week. Dr. Jones believed that Cindy's problems had been resolved.

On March 26, 1981, Cindy returned to Dr. Jones' office. She said that she had vomited the day before and that she might be suffering from the flu. While palpating Cindy's abdomen, Dr. Jones noticed some tenderness, indicating that a "small pocket of infection" may remain. He changed Cindy's medication from Amoxicillin to Cleosine and instructed her to return in one week.

On April 2, 1981, Cindy visited Dr. Jones' office and complained of being weak. After examining Cindy in the usual manner, Dr. Jones determined that there was no longer any evidence of an infection. Dr. Jones released Cindy to return to work.

At the conclusion of Dr. Jones' testimony, he further described peritonitis and p.i.d. He acknowledged that a person with p.i.d. would have tenderness in the adnexal region. He indicated that both p.i.d. and peritonitis could cause cystitis. He discussed the results of Cindy's urinalysis, blood tests, and cultures. He acknowledged that he never ordered abdominal X rays, a sonogram, a laparoscope examination, or a rectal examination, or personally performed a pelvic examination during his treatment of Cindy.

Dr. James K. Martins testified as plaintiffs' expert witness. He testified regarding his educational and medical background. As a Fellow of the American Board of Medical Legal Consultants (a group

whose members are paid to review cases sent to them in which medical malpractice is alleged and to determine whether the doctors involved have complied with appropriate standards of care), Dr. Martins reviewed Cindy's medical records. He described these records and indicated they were records normally relied upon by persons in the medical field in arriving at opinions and conclusions. Dr. Martins described himself as a general practitioner practicing in a small community. He stated that he had treated patients with abdominal disorders, appendicitis, p.i.d., gastroenteritis, pelvic abscesses, and cystitis. He acknowledged that he was paid $100 in advance to review Cindy's medical records and that he was being paid his standard fee ($300 per half day/$500 per full day) for his time spent in testifying.

Dr. Martins stated that he is familiar with the standards of care required of a general practitioner in Arthur or a similar community in his treatment of a woman in Cindy's condition. Generally, these standards require that a physician perform an adequate examination of the patient, conduct necessary diagnostic testing, receive adequate consultation if necessary, formulate a diagnosis and a differential diagnosis, provide adequate treatment for the patient's condition, and keep sufficient records.

In Dr. Martins' opinion, Dr. Jones did not conform to the above standards of care in his treatment of Cindy during March and April 1981. Dr. Martins based his opinion on the fact that Dr. Jones never performed a rectal examination or pelvic examination himself but instead relied upon examinations by others. Dr. Martins stated that Dr. Jones' diagnostic testing was insufficient in that he failed to take X rays and failed to perform sonography or a laparostomy. Dr. Martins opined that Dr. Jones' interpretation of certain test results was inadequate and that Dr. Jones prescribed medication in an inadequate and sporadic manner. He stated that Cleosine should not have been given to a person suffering from gastroenteritis. Dr. Martins also criticized Dr. Jones for his lack of consultation and his insufficient records. Dr. Martins stated that the diagnosis of gastroenteritis was inappropriate since the pelvic examination performed by Martin showed rigidity, tenderness, and a lack of vaginal discharge.

In Dr. Martins' opinion, the draining of the pelvic abscess performed by Dr. Laidlaw would have been inevitable. However, if Dr. Jones' treatment of Cindy had conformed to required standards of care, this procedure would not have been as extensive. Additionally, if Cindy's condition had been diagnosed earlier and the abscess drained earlier, the second and third procedures performed on Cindy would have been unnecessary. Although he could not be sure, Dr. Martins

stated that if Dr. Jones had not deviated from required standards of care in his treatment of Cindy, her right fallopian tube would not have been damaged.

On cross-examination Dr. Martins reviewed his background. He further described the American Board of Medical Legal Consultants. He stated that the purpose of the group is to review cases and to render opinions in cases where medical malpractice is suspected. A request for review is submitted to the group by an attorney, and the group charges a fee for its services. Dr. Martins has been a member of the group for two to three years, and 80% of his time is devoted to consulting work for the group. He has reviewed over 700 cases, given 60 depositions, and testified at 30 trials. Dr. Martins was asked whether his testimony has usually been for "plaintiffs, or that is people suing doctors," and plaintiffs' objection to the question was overruled. Dr. Martins answered "yes." Dr. Martins acknowledged that he had testified in many States and in many different types of cases. Dr. Martins was also asked questions concerning his annual income from consulting work for the years 1983 and 1984. Plaintiffs' objections to the questions were overruled, and Dr. Martins answered $29,000 for 1983 and $44,000 for 1984.

Dr. Martins stated that the standards of care earlier recited were matters of general knowledge. He testified that he believed Cindy's condition was properly diagnosed when she entered Christie Clinic and Dr. Laidlaw removed the pelvic abscess. His only dissatisfaction with Dr. Laidlaw's treatment of Cindy was that he failed to have the abscess analyzed. Dr. Martins discussed the laparoscopy procedure, vaginal and pelvic examinations, gastroenteritis, peritonitis, and p.i.d. He stated that Martin's finding of rigidity during the pelvic exam could be a symptom of peritonitis. He stated that p.i.d. is an inflammation of the fallopian tubes and that even a minimal case can cause sterility. Dr. Martins stated that Cindy did not experience any adverse side effects from being given Cleosine and acknowledged that Cleosine had been given to Cindy while she was at Mercy. When Dr. Martins stated that Dr. Jones' inadequate recordkeeping could have caused Cindy's illness, he was impeached with a prior inconsistent statement.

Dr. Laidlaw, an obstetrician and gynecologist, testified to his educational and professional background. Dr. Laidlaw's treatment of Cindy commenced April 3, 1981. Cindy appeared ill upon her visit to his office at Christie Clinic. At first Dr. Laidlaw believed Cindy had an ectopic pregnancy. But after aspirating the cul-de-sac (inserting a needle to withdraw liquid from the area between the uterus and co-

lon), Dr. Laidlaw believed Cindy's condition to be p.i.d. Dr. Laidlaw had expected to withdraw blood, but, instead, he withdrew pus. He later indicated that the pus might have come from the end of the fallopian tube and may have caused damage to the tube. Dr. Laidlaw performed a pelvic examination and diagnosed Cindy's condition as p.i.d. with pelvic peritonitis. Dr. Laidlaw admitted Cindy to Mercy Hospital.

At Mercy, Cindy was given antibiotics and instructed to rest. An ultrasound revealed that Cindy had a mass in her left pelvis. The results of a pregnancy test were negative.

On April 9, 1981, Dr. Laidlaw performed surgery to remove a lemon-size mass found in the cul-de-sac. He opened Cindy's abdomen and drained the abscess from her left pelvis. He also noted that her appendix had ruptured and that her fallopian tubes showed signs of p.i.d. Dr. Laidlaw stated that the abscess could have resulted from the ruptured appendix or from p.i.d. Upon discovering a fecalith (a small amount of feces), indicating a possible rupture of the bowel, he called in Dr. Don A. Fischer. Dr. Laidlaw acknowledged that the presence of the fecalith could have been the result of acute appendicitis. Dr. Fischer performed a colostomy on Cindy to prevent fecal peritonitis, which could be fatal. Dr. Fischer also performed an appendectomy. Cindy was treated with antibiotics and discharged on April 17, 1981.

Dr. Laidlaw opined that the cause of the conditions requiring surgery was either p.i.d. or a ruptured appendix. He stated that p.i.d. was more probable due to a low white blood cell count. Although the p.i.d. could have been secondary to the ruptured appendix, the p.i.d. was not caused by the ruptured appendix.

Dr. Laidlaw testified that Cindy's left fallopian tube and ovary were removed March 4, 1982. Because of the damage to Cindy's system, her ability to conceive has been greatly reduced. She also faces an increased risk of an ectopic pregnancy. The p.i.d. is a factor in the decreased likelihood of conception. Although Cindy thought she might be pregnant on two occasions, tests results were negative. Dr. Laidlaw prescribed birth control pills on May 31, 1983. Cindy is under no present restrictions as a result of the p.i.d., and Dr. Laidlaw has not advised her to not work. Dr. Laidlaw also testified to his charges for the services rendered to Cindy.

During cross-examination, Dr. Laidlaw reviewed his treatment of Cindy during her first visit to him on April 3, 1981. Dr. Laidlaw stated that Cindy may be a candidate for an ova transport, an alternative means of conception. Dr. Laidlaw described Cindy's surgical scars. Dr. Laidlaw acknowledged that the progress of p.i.d. can be dif-

ficult to predict.

On redirect examination Dr. Laidlaw stated that he would not perform another laparoscope examination on Cindy. He also stated that p.i.d. can cause sterility.

Dr. Fischer, a surgeon specializing in general surgery, testified regarding his background. Dr. Fischer's treatment of Cindy commenced April 9, 1981, when he was called to assist Dr. Laidlaw. Dr. Fischer had found a pelvic abscess (a collection of pus in the lower abdominal cavity) and inflammation of Cindy's pelvic organs. Dr. Fischer performed a diverting colostomy by bringing part of Cindy's bowel through the abdomen so that her lower intestinal tract would not be damaged. Although he does not recall whether Cindy's appendix had ruptured, Dr. Fischer recalled performing an appendectomy. A person normally remains in the hospital for 10 days after a colostomy.

Dr. Laidlaw testified that Cindy was later readmitted for closure of the colostomy. She was prepared for the procedure by being given laxatives and enemas for three to four days prior to the procedure. The closure was accomplished without complications. A person who receives a colostomy closure is usually discharged 7 to 10 days later.

Cindy was called to the witness stand again to testify to the medical expenses she incurred.

Plaintiffs rested. Defendant's motion for a directed verdict was denied.

Martin testified on behalf of Dr. Jones. She described her training and certification as a physician's assistant and stated that a physician's assistant may perform any medical procedure under supervision as long as the supervising physician is trained and able to perform the procedure. She testified that her duties include performing pelvic examinations, and she described a pelvic examination.

Martin did not participate in Cindy's examination on March 3, 1981. However, at Cindy's mother's request, Martin arranged for Cindy to receive a shot at Jarman the following day. Martin stated that Cindy brought in a urine specimen on March 5, 1981. When she was visited by Martin at Jarman on March 9, 1981, Cindy appeared acutely ill. On March 10, 1981, Dr. Jones instructed Martin to perform a pelvic examination on Cindy and to obtain a culture of any discharge. Cindy was reluctant to undergo the examination. Martin found that Cindy's abdominal muscles were rigid and, therefore, it was difficult to ascertain whether Cindy's ovaries were enlarged. There was no discharge from the cervix or discoloration. Martin visited Cindy again on March 11, 1981. On March 12, 1981, Cindy was moving around and no longer vomiting or suffering from diarrhea.

She indicated that she wanted to be discharged. On March 13, 1981, Cindy was discharged. Although Martin had no professional contact with Cindy after her discharge from Jarman, Cindy appeared normal and healthy on April 2, 1981, when Martin saw her. Martin learned that Cindy had gone to Mercy about six to seven days after she was admitted.

On cross-examination Martin again related the findings of the pelvic examination and discussed the notes and records she reviewed before testifying. Martin acknowledged that the medical records revealed a very tender cervical adnexa (the tissues adjacent to the ovaries and uterus.)

Dr. Jones reviewed his educational and professional background. He stated that he normally treats persons with symptoms similar to those of Cindy by examining them, telling them a definitive diagnosis cannot be made, and asking them to return later. Although Dr. Jones believed Cindy's pregnancy test at Jarman to be falsely positive, he cancelled the Kaeflex and X rays so that if a later test proved positive, his actions would not be questioned by a hospital committee. Dr. Jones recalled that Cindy's bowel was beginning to function and her temperature returned to normal on the day prior to her discharge from Jarman. Although Cindy complained of weakness on April 2, 1981, he released her to return to work because he believed working might help her return to her normal vigor. Dr. Jones discussed positive and negative findings and stated that negative findings are not normally recorded.

Dr. Jones stated that he was familiar with the standards of care required of physicians practicing in Arthur and similar communities in 1981. Dr. Jones had reviewed Cindy's hospital records from Mercy. These did not indicate that Cindy was dehydrated, and Dr. Jones opined that she should have been dehydrated considering the length of time she had been vomiting. Dr. Jones stated that he did not deviate from any standards of practice in treating a possible ruptured appendix. When the appendix has ruptured over several days (as opposed to instantaneously) surgery should be delayed for four to six weeks. Dr. Jones knows of no tests to diagnose a ruptured appendix once peritonitis has set in. Dr. Jones did not perform a pelvic examination on March 7, 1981, or March 8, 1981, since Dr. Sands had just performed one and he did not want to subject Cindy to another. This failure did not constitute a deviation from the appropriate standard of care. Dr. Jones instructed Martin to perform the pelvic examination on March 10, 1981, rather than performing the examination himself, because he believed that many women prefer that a pelvic examina-

tion be performed by another woman. Martin is capable at performing pelvic examinations. Instructing Martin to perform the pelvic examination, rather than performing it himself, did not constitute a deviation from the appropriate standard of care. Dr. Jones did not believe consultation was necessary since Cindy's condition was improving while at Jarman. The lack of consultation did not constitute a deviation from the appropriate standard of care. Dr. Jones did not order X rays or a pelvic sonogram because he believed these tests to be either unnecessary or impractical. These failures did not constitute deviations from the appropriate standards of care. Dr. Jones did not perform a laparoscopy or a rectal examination because he believed these tests were unnecessary. These failures did not constitute deviations from the appropriate standards of care. Dr. Jones prescribed Cleosine for Cindy's peritonitis. Prescribing Cleosine did not constitute a deviation from the appropriate standard of care. Dr. Jones stated that his record keeping conformed to the appropriate standard of care.

Dr. Jones was informed by Cindy's mother that Cindy had entered Mercy 7 to 10 days after Cindy's surgery.

On cross-examination Dr. Jones stated that although a ruptured appendix was a differential diagnosis of Cindy's condition at the time she entered Jarman, he never informed her of this diagnosis. He stated that a rectal shelf examination cannot be used to diagnose a ruptured appendix. During his treatment of Cindy, Dr. Jones believed she might have p.i.d. Dr. Jones was aware that p.i.d. could cause sterility, and he stated that by the time the condition can be diagnosed, the damage may already be done. He believed it was unnecessary to determine whether Cindy had p.i.d. after she began feeling well. Because the peritonitis was clearing, Dr. Jones believed the cause was clearing as well. At the time of Cindy's discharge from the hospital, Dr. Jones diagnosed Cindy's condition as gastroenteritis. Although he had ruled out a ruptured appendix, he had not ruled out p.i.d. as a possible cause.

At the conclusion of the trial, Dr. Jones' motion for a directed verdict was denied. The jury returned verdicts in favor of Dr. Jones on both counts. Judgment was entered on the verdicts.

Plaintiffs filed a timely post-trial motion requesting either a judgment notwithstanding the verdict or a new trial. Plaintiffs' post-trial motion was denied. Plaintiffs filed a timely notice of appeal.

On appeal plaintiffs raise four issues: (1) whether the trial court erred in denying plaintiffs' motion for judgment notwithstanding the verdict; (2) whether the trial court erred in denying plaintiffs' motion for a new trial in which they argued that the verdicts were against

the manifest weight of the evidence; (3) whether the trial court erred in permitting defendant's counsel to ask plaintiffs' expert witness whether he usually testified for "plaintiffs, or that is people suing doctors"; and (4) whether the trial court erred in permitting defendant's counsel to ask plaintiffs' expert witness questions regarding his annual salary for consulting work. All four issues were raised in plaintiffs' post-trial motion.

Plaintiffs argue, first, that the court erred in denying their motion for judgment notwithstanding the verdict. A judgment notwithstanding the verdict should be entered when all the evidence, viewed most favorably to the opponent, overwhelmingly favors the movant so that no contrary verdict could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) The *Pedrick* rule applies to medical malpractice cases in the same fashion as to other civil litigation. *McMillen v. Carlinville Area Hospital* (1983), 114 Ill. App. 3d 732, 450 N.E.2d 5.

Viewing the evidence in the light most favorable to Dr. Jones, we do not believe that the evidence so overwhelmingly favors plaintiffs that a verdict for Dr. Jones could not stand. Dr. Jones' testimony substantially countered the testimony of plaintiffs' expert witness, Dr. Martins. Also, we note that the medical testimony at trial indicated that throughout Cindy's illness there appeared to be some confusion as to the exact cause of her condition. For these reasons, the trial court properly denied plaintiffs' motion for judgment notwithstanding the verdict.

Plaintiffs argue, second, that they are at least entitled to a new trial for the reason that the verdicts are against the manifest weight of the evidence. A jury's verdict should be set aside if it is contrary to the manifest weight of the evidence. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.) A verdict is contrary to the manifest weight of the evidence only if it is wholly unwarranted by the evidence or clearly the result of passion or prejudice. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.) A verdict cannot be set aside merely because the jury could have drawn different inferences and conclusions from conflicting testimony or because the reviewing court would have reached a different conclusion if it had been the trier of fact. *Turner v. Chicago Transit Authority* (1984), 122 Ill. App. 3d 419, 461 N.E.2d 551.

Plaintiffs argue that they set forth a *prima facie* case of medical malpractice which Dr. Jones failed to overcome. Relying mainly on his own testimony, Dr. Jones argues that he presented sufficient evidence to overcome plaintiffs' allegations. Again, we note that the

medical testimony was conflicting as to the exact cause of Cindy's condition. The resolution of the conflicting testimony depended largely upon the credibility of plaintiffs' expert witness, Dr. Martins, and the credibility of Dr. Jones. It is the province of the jury to determine the credibility of the witnesses and to assess the weight to be accorded their testimony. (*Lee v. Chastang* (1979), 79 Ill. App. 3d 622, 398 N.E.2d 1250.) In the instant case the jury was free to believe the testimony of Dr. Jones over the testimony of Dr. Martins or any other medical witness. Under these circumstances, we cannot say that the jury's decision was against the manifest weight of the evidence.

Plaintiffs argue, third, that the trial court erred in permitting Dr. Jones' counsel to ask Dr. Martins whether he usually has testified for "plaintiffs, or that is people suing doctors." Plaintiffs argue that such an inquiry is designed to impugn the integrity of physicians who testify as expert witnesses rather than to establish bias, a practice of which Illinois courts take a dim view. (See *Hunter v. Sukkar* (1982), 111 Ill. App. 3d 169, 443 N.E.2d 774.) In response, Dr. Jones argues correctly that due to the nature of expert testimony, great latitude is allowed in cross-examination to show interest, bias, or motive. (See *Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.) Dr. Jones argues that repeated testimony on behalf of one party in a medical malpractice case could show bias or, when the testimony is on behalf of the plaintiff, a tendency to find fault.

In addition to other cases, plaintiffs cite *Schoolfield v. Witkowski* (1964), 54 Ill. App. 2d 111, 203 N.E.2d 460, in support of their argument. In *Schoolfield* plaintiff's expert medical witness was asked on cross-examination how many times he had testified at trials in the preceding year and if his testimony at these trials had not always been for the plaintiff, "the person seeking to gain money." The plaintiff's objections were overruled. The appellate court held that "the above questions were intended to show that the witness was biased in favor of the plaintiff, but asking whether the witness had, in the past year, testified only for plaintiffs, was improper cross-examination." (54 Ill. App. 2d 111, 127, 203 N.E.2d 460, 467.) However, the appellate court held that any error was harmless since the witness' testimony was restricted to the question of damages and since the jury found for the defendants on the issue of liability and never reached the question of damages.

In response, Dr. Jones cites *Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 466 N.E.2d 210, in support of his position that the question was proper. In *Sears* the supreme court held that a plaintiff's medical expert may be cross-examined about the frequency of refer-

rals from the plaintiff's attorney and the financial benefit derived from those referrals. He argues that the *Sears* holding should be extended to allow questions on cross-examination concerning the nature of testimony derived from any referrals.

We decline to extend *Sears* to the extent requested by Dr. Jones. The questions asked in *Schoolfield* are identical in substance to the question asked in the instant case, and *Schoolfield* is easily distinguishable from *Sears*. In *Sears* the question directly linked the witness's pecuniary interests to his testimony. No direct connection was present in *Schoolfield*, nor is it present in the instant case.

■ Dr. Jones argues that the error was invited by plaintiffs' direct examination of Dr. Martins. He argues that because plaintiffs' counsel questioned Dr. Martins about his involvement with the American Board of Medical Legal Consultants, plaintiffs "opened the door" to further questioning. However, the number of times Dr. Martins testified on behalf of plaintiffs is not related to Dr. Martins' testimony on direct examination. We note that during the direct examination of Dr. Martins, he stated that in about 40% of the cases submitted to the American Board of Medical Legal Consultants the Board finds that no deviation from the appropriate standard of care occurred. Dr. Jones' counsel objected, and the court sustained the objection, instructing the jury to disregard the comment. Because Dr. Martins was not permitted to testify as to the percentage of cases in which the Board finds in favor of the defendant doctors, he similarly should not have been required to testify as to the frequency of his testimony in favor of plaintiffs. The error committed by Dr. Jones' counsel was not invited by plaintiffs.

■ Having concluded that the court erred in allowing the question under consideration, we must next determine whether plaintiffs were prejudiced by the error. A party assessing error on appeal must demonstrate to the court that prejudice resulted from the error. (*In re Marriage of Hofstetter* (1981), 102 Ill. App. 3d 392, 430 N.E.2d 79.) Plaintiffs request that we presume prejudice. However, we believe this unnecessary since the prejudice resulting from the error is clearly evident. Dr. Martins was plaintiffs' only expert medical witness. As we indicated earlier, the result of this case depended largely upon the credibility of Dr. Jones and Dr. Martins. Because the error may have adversely affected Dr. Martins' credibility, the jury may have been improperly influenced by the error. For this reason, we must reverse the judgment below and remand the cause to the trial court for a new trial.

■ Plaintiffs argue, fourth and finally, that the trial court erred

in allowing defendant's counsel to ask Dr. Martins questions about his annual salary derived from reviewing cases for the American Board of Medical Legal Consultants and from testifying at trials. We believe it is necessary to discuss this issue to guide the trial court on remand.

In support of their position, plaintiffs cite the following excerpt from a legal encyclopedia:

> "[T]he court may, in its discretion, allow counsel to cross-examine the witness as to the amount he received or expects to receive for testifying as an expert, but not as to compensation received in other cases or for other services, unless such compensation has a material bearing on the interest of the witness in the case at bar." (31 Am. Jur. 2d *Expert and Opinion Evidence* sec. 50 (1967).)

Plaintiffs also cite cases which state that a party's expert medical witness may be asked on cross-examination questions concerning the number and frequency of referrals from the party's attorney and the compensation derived from those referrals (*Sears v. Rutishauser* (1984), 102 Ill. 2d 402, 466 N.E.2d 210) and which state that a party's expert medical witness may be asked questions on cross-examination concerning compensation received from testifying for the same party in other cases. (*City of Chicago v. Van Schaack Brothers Chemical Works, Inc.* (1928), 330 Ill. 264, 161 N.E. 486; *Gordon v. City of Chicago* (1903), 201 Ill. 623, 66 N.E. 823.) Plaintiffs argue that the holdings of these cases imply that it is improper to question an expert witness on cross-examination as to his compensation for testifying in cases not connected with the case on trial or in cases not involving attorneys in the case on trial.

In response Dr. Jones argues that the trial court did not abuse its discretion in permitting his counsel to ask Dr. Martins questions concerning his annual salary from consulting work. He states that the questions asked of Dr. Martins were designed to show that he is not as much of a "practicing" physician as he purported to be. In support of his argument that the questions were proper, Dr. Jones also cites *Sears* and *Van Schaack Brothers*. He argues that, just as in those cases it was proper to ask the expert witness about his referrals from a certain attorney or about his income from a certain party, it was proper in this case to ask Dr. Martins about his income from a certain source—the American Board of Medical Legal Consultants.

We agree with plaintiffs that the questions posed to Dr. Martins were improper. The questions regarding Dr. Martins' annual income from consulting work were in no way relevant to any legitimate purpose of cross-examination. Although Dr. Jones argues that the ques-

724

tions were designed to show that Dr. Martins was not a full-time general practitioner, questions concerning only Dr. Martins' income from consulting work do not accomplish this objective. This objective had already been accomplished by Dr. Jones when, on cross-examination, Dr. Martins was asked questions about the percentages of time he devotes to his consulting work and to his practice. In addition, cases such as *Sears* and *Van Schaack Brothers* are readily distinguishable. Such cases concern only referrals or income from an attorney or party involved in the action at trial. Again, we believe the prejudice resulting from this error to be clearly evident. On remand any evidence relating to Dr. Martins' income from consulting work, other than his income for testifying in the case at trial, should be excluded.

For the foregoing reasons, the judgment of the circuit court of Douglas County is reversed. The cause is remanded for a new trial on all issues.

Reversed and remanded.

WEBBER and SPITZ, JJ., concur.